### CLARK MARINE CORPORATION
#### v.
### CARGILL, INC., Cargo Carriers, Inc., Lloyd Graving and Tom Betts.
#### Civ. A. No. 2618.

United States District Court
E. D. Louisiana,
Baton Rouge Division.

Feb. 10, 1964.

John L. Avant, Dodd, Hirsch, Barker, Avant & Wall, Thomas H. Benton, Benton & Moseley, Alvin B. Rubin, Sanders, Miller, Downing, Rubin & Kean, Baton Rouge, La., for plaintiff.

Lawrence W. Brooks, Charles W. Phillips, Taylor, Porter, Brooks, Fuller & Phillips, Baton Rouge, La., E. C. Heininger, Leo F. Tierney, Mayer, Friedlich,

Spiess, Tierney, Brown & Platt, Chicago, Ill., for defendants.

WEST, District Judge.

This is an action seeking a permanent injunction, together with treble damages for alleged violation of the Federal antitrust laws, 15 U.S.C.A. § 1 et seq. Petitioner, Clark Marine Corporation, hereinafter referred to as "Clark", originally alleged that respondents, Cargill, Inc., hereinafter referred to as "Cargill", Cargo Carriers, Inc., hereinafter referred to as "Cargo", Lloyd Graving, and Tom Betts, conspired to monopolize all of the docking, fleeting, switching, and repair services in the Port of Baton Rouge. During the trial, however, it was stipulated that the monopoly alleged pertained only to the fleeting and switching of grain barges.

Clark is a Louisiana corporation, organized in July, 1960, and at all times pertinent to this suit, engaged in fleeting, switching, boat cleaning, and boat repair business in the Port of Baton Rouge. Cargill is primarily a grain company, with headquarters in Minneapolis, Minnesota, which does business on an international scale. It operates the only grain elevator in the Port of Baton Rouge under lease agreement with the Greater Baton Rouge Port Commission. Cargo is primarily a water transportation company, and is a wholly-owned subsidiary of Cargill. Cargo's primary function is to provide, either by use of its own barges and equipment, or by contract with other carriers, for the transportation of Cargill's commodities. Lloyd Graving is the manager of Cargill's Baton Rouge operation, and Tom Betts is the manager of Cargo's Baton Rouge operation.

The Court having split the issues involved in this case for the purposes of trial, this cause came on for trial, without a jury, on November 4, 5, 6, 7, and 12, 1963, on the issue of liability only, i. e., for a determination of the question of whether or not respondents are liable to petitioner under the provisions of the Federal antitrust laws, 15 U.S.C.A. § 1 et seq. If liability were found to be present, the question of quantum was to be resolved by a subsequent trial limited to that issue.

After hearing five days of evidence, and after carefully considering all of the documentary evidence, as well as the briefs and arguments of counsel, this Court concludes that petitioner has failed to carry the burden of proving that respondents in any way conspired to monopolize, or that they did in fact monopolize any of the fleeting and switching business in the Port of Baton Rouge, Louisiana, in violation of the Federal antitrust laws. In accordance with this conclusion, the Court now makes the following Findings of Fact and Conclusions of Law.

## FINDINGS OF FACT

1. Cargill has, since 1955, operated a grain elevator at Port Allen, Louisiana, which is located in the heart of the Baton Rouge Port. This elevator accepts grain for storage from many sources throughout the country, and is operated in competition with fourteen other large elevators in the Lower Mississippi Gulf area. Cargill's elevator, like those of its competitors, is primarily an export elevator. They store grain, which comes from grain surplus areas in the United States. They receive export orders calling for specific grades and types of grain, and in accordance with these orders, grain of the various grades are mixed and blended to meet the requirements of the contract. After mixing and blending, the grain is transferred from the elevator into ocean-going vessels for shipment overseas or to points of destination as called for by the contracts. Approximately 35 per cent of the grain received by Cargill moves to the Cargill elevator by railroad car, and approximately 65 per cent of the grain received moves into the port area and to the elevator by river barge. Of the 65 per cent of the grain moving into the Baton Rouge Port by barge, approximately 40 per cent is carried by barges owned or managed by Cargo, a wholly-owned subsidiary of Cargill. The balance of the grain coming into the port area by barge is carried on barges owned and

operated by other barge lines. These barges, which are moved up and down the Mississippi River, are made up into "tows" of several barges made up together, and are pushed up and down the river by line tow boats. In 1955, when Cargo commenced operating in the Baton Rouge Port, a tow consisted of very few barges, seldom more than three. However, as the size of line tow boats increased, the size of the tows increased, so that by 1959 a tow would normally consist of twelve to fifteen barges. In 1959 the so-called super line towboat made its appearance on the River, and these boats, being large and powerful, were capable of pushing tows consisting of thirty or more barges. As these large tows reached the port area, it is obvious that they could not be simultaneously unloaded into the elevator. Consequently, it was necessary to "park" these barges while awaiting their turn for unloading. Consequently, an area convenient to the elevator had to be provided for a sort of parking place for these barges. This area is referred to as a "fleet", and because of the fact that these large towboats were rather unwieldy, they were not suitable for "switching" or moving the barges out of their tow and into the fleet. Consequently smaller harbor towboats are used to "switch" the barges from the tow to the fleet, and later from the fleet to another tow for return to its point of departure or elsewhere. Ordinarily the owner or operator of the "fleet" charges a certain rate per day to the owner of the barge for each day that the barge remains in the "fleet", and the owner of the switching boat charges either a per hour fee or a per switch fee for switching a barge in or out of the fleet. Also, it is not always practical to unload the barges in the order in which they arrive at the port because of the fact that it is necessary for the elevator to mix and blend different kinds of grain in order to fill certain orders, and consequently, they must take the grain from the barge which is carrying the particular type of grain needed for the mixing and blending then in process.

2. At the time Cargill commenced business in the Port of Baton Rouge, its elevator had a capacity of approximately 2.5 million bushels of grain. In 1959 the capacity of the elevator was increased to 7.7 million bushels, and in the past year, approximately 115 million bushels of grain passed through the Cargill elevator.

3. The Port of Baton Rouge receives from 7,000 to 8,000 inbound barges per year, of which number from 60 to 70 per cent are grain barges bound for the Cargill elevator. The remaining barges carry commodities such as gasoline, fuel oil, petroleum, sodium hydroxide, and other industrial chemicals, as well as iron ore, scrap iron, aluminum ores, etc. This suit in no way involves the switching or fleeting of any barges other than grain barges destined for the Cargill elevator. Petitioner is not now contending that defendants have in any way conspired to monopolize or have in fact monopolized the switching or fleeting of any barges other than grain barges as the testimony shows conclusively that respondents have not handled anything other than grain barges in the Port of Baton Rouge.

4. At the time of Cargill's entry into the Port of Baton Rouge in 1955, the fleeting and switching services in the port were performed almost exclusively by two companies, Kenneth A. Hutton, and Louisiana Marine Services. (Louisiana Marine Services is apparently a subsidiary of Baton Rouge Coal and Towing Company, and sometimes the names of these two companies are used interchangeably.) Baton Rouge Coal and Towing Company and/or Louisiana Marine Services handled most of the fleeting and switching of petro-chemical barges and barges carrying commodities other than grain. Kenneth A. Hutton maintained a fleeting area on the west bank of the River (the same side on which the Cargill elevator is located) about one and a half miles up river from the elevator. Louisiana Marine's fleeting area was located on the east bank of the River approximately across the River from the Hutton fleeting area. Between 1955 and

1958, practically all of the fleeting and switching in the Port of Baton Rouge, including the fleeting and switching for Cargill, was done by these two companies.

5. Approximately 60 per cent of the grain transported to the elevator by barge was carried on barges owned by various barge lines, such as Mississippi Valley Barge Line, Federal Barge Line, Upper Mississippi Towing Company, Union Barge Line, American Barge Line, Sioux City Barge Line, etc. The fleeting and switching for all of these carriers, between 1955 and 1958, as well as the fleeting and switching required by Cargo, was done by either Hutton or Louisiana Marine Services.

6. Delays in the handling of barges in the port are extremely expensive both to the barge line involved and to Cargill. For instance, when the elevator is closed down because of the unavailability of barges, the cost to Cargill of shutting down the elevator is approximately $500 per hour. Also, where barges are forced to remain in stream, there is a demurrage charge to Cargill for failure to unload the barges promptly. Consequently, if there are 60 barges waiting in the river to be unloaded, and the elevator is shut down for four hours, there results 240 hours, or 10 full days of demurrage chargeable to Cargill, together with a shutdown cost of approximately $2,000. Thus, the necessity for expeditious handling of the barges becomes apparent.

7. During the period 1955 through 1958, there were many complaints emanating from Cargill and from the other carriers involved concerning the caliber of the fleeting and switching services performed by the two available companies in the Baton Rouge Port area. When repeated complaints failed to improve the service, the management of Cargill at Baton Rouge suggested to its home office in Minneapolis that their subsidiary, Cargo, be established in the fleeting and switching business in the Port of Baton Rouge. The home office management of Cargill was reluctant to have Cargo enter into the fleeting and switching business in Baton Rouge, and suggested that the Greater Baton Rouge Port Commission be contacted and requested to establish a suitable fleeting and switching service in the port. This was done, but the Greater Baton Rouge Port Commission refused to engage in the fleeting and switching business in the Baton Rouge Port. Thereafter, in order to obtain for its own operations what Cargill believed would be fleeting and switching services superior to those available in the Port of Baton Rouge, it arranged for its wholly-owned subsidiary, Cargo Carriers, to engage in furnishing those services in the Port of Baton Rouge. A survey of the business of the Baton Rouge Port was conducted by Cargo officials and by Cargill, and it was their conclusion that such an operation on the part of Cargo could not be profitable if limited to the switching and fleeting only of Cargo owned or managed barges. It was, however, the considered opinion of the officials of Cargo that they could reasonably expect to attract some of the fleeting and switching business of the other barge lines transporting grain into the Baton Rouge area, and that if this prediction was correct, their operation could be profitable. Consequently, as the result of this survey, Cargo Carriers entered into the fleeting and switching business in the Port of Baton Rouge on April 1, 1959. At that time, Kenneth Hutton and Louisiana Marine Services were both in the fleeting and switching business in the harbor. Also, a Captain Joe Hightower and a Captain Bert Kleinpeter each had a small boat that was suitable for switching and was available, when needed, to perform harbor work.

8. Cargo Carriers was an efficiently organized and apparently excellently managed company which was able to provide fleeting and switching services of a superior quality to those supplied by Hutton and Louisiana Marine Services insofar as the fleeting and switching of grain barges was concerned. As a result of this efficient operation, several of the barge lines who had been previously giving their fleeting and switching business to either Hutton or Louisiana Marine

Services switched over and gave their business to Cargo.

9. In the six month period immediately prior to April, 1959, when Cargill entered the fleeting and switching business in Baton Rouge, 492 grain barges were unloaded at the elevator, and the elevator had been forced to shut down a total of 67 hours. During the six month period immediately following the entry of Cargill into the fleeting and switching business in the Port of Baton Rouge, the elevator unloaded over 750 barges, but was forced to be idle only 35 hours. These facts clearly indicate that the services rendered to the elevator and to the barge lines by Cargo were vastly superior to those which had been previously furnished by the other available companies in the fleeting and switching business.

As a result of the obviously superior service rendered by Cargo in the port area, Kenneth Hutton lost substantial business from the various barge lines, and ultimately went out of business. Louisiana Marine Services also lost substantial business, but it, or Baton Rouge Coal and Towing Company, retained, and still retains, most of the fleeting and switching of petro-chemical barges and other barges not connected with the transportation of grain. Thus, purely and simply because of the ability of Cargo to render a more efficient and more dependable service, a large percentage of the fleeting and switching of grain barges after April 1, 1959, was done by Cargo Carriers, Inc.

10. Petitioner, Clark Marine Corporation, is a corporation incorporated under the laws of Louisiana on July 14, 1960, with an initial paid in capital of approximately $200,000. At the time of its incorporation, it was intended that the corporation would develop dry dock facilities and engage in the business of repairing boats, and that it would also engage in the business of steam cleaning and gas freeing petro-chemical barges by use of a mobile steam cleaning plant to be purchased and mounted on a barge. In furtherance of these plans, petitioner purchased approximately 32 acres of land in an area north of the Mississippi River Bridge at Baton Rouge, Louisiana, known as Devil's Swamp, which area is located approximately 7 miles from the center of the Baton Rouge harbor area. This area is in a "dead water" location, and hence, was a suitable area for the conducting of a ship repair and steam cleaning business. The property was purchased by petitioner for the sum of approximately $64,000, and an additional $34,000 was spent filling, grading, and improving the property. Thereafter, the mobile steam cleaning plant was purchased for approximately $181,000.

11. The dry dock facilities were never constructed by petitioner, and apparently, in the early part of 1961, petitioner abandoned the idea of providing dry dock services. Dry dock services were available from a company known as Dravo Corporation, which corporation, at the time, was apparently considering the possibility of also providing steam cleaning and gas freeing services in the Port of Baton Rouge. By agreement between petitioner and Dravo, Clark agreed to abandon its plans for developing a dry dock service in exchange for Dravo agreeing to abandon its plans to provide steam cleaning and gas freeing services in the port. As was stated by Captain Clark, President of Clark Marine, "As both of these items are expensive and are used together to provide ship services, the effect of this understanding was to reduce the investment by both firms, and still, in a manner of speaking, split the business available in the area on somewhat the same basis that would have occurred had we been in full competition."

Thus, after this decision was made, the primary business, and in fact, the only business of Clark, was that of steam cleaning and gas freeing petro-chemical barges.

12. The Devil's Swamp area where Clark was located, being approximately 7 miles from the location of the Cargill elevator, was obviously not a suitable area for fleeting and switching grain barges from the elevator. The cost of moving the barges to and from such a fleeting

area would place Clark at a serious economic disadvantage when compared with other fleeting and switching services located in close proximity to the Cargill elevator. Even though Clark attempted to show, during the trial of this case, that they did intend to engage in the fleeting and switching business while still located at Devil's Swamp, nevertheless the evidence is overwhelming to the contrary. It is obvious that Clark's intention was to acquire a suitable location for fleeting if they found it feasible to attempt to engage in the fleeting and switching business. To try to determine the feasibility of this, they put out "feelers" by way of advertisements in the Waterways Journal in February and March of 1961. Whenever they contacted potential customers, though, they were careful to point out that they expected to have a suitable fleeting area available in the center of the port area.

13. During the first year of Clark's operation, while located in the Devil's Swamp area, the corporation lost approximately $91,000. This loss was in addition to an expenditure of approximately $42,000 in pre-operational expenses, making a total loss from the date of its incorporation on July 14, 1960 through June 30, 1961, of approximately $133,000. Thus, Clark Marine, with an initial paid in capital of only $200,000, was in very precarious financial condition at the end of its first year of operation. The financial reports of this corporation show beyond any question of doubt that its administrative overhead expenses were out of all proportion to its needs, and that these expenses, during the first year of operation, actually exceeded the total gross income of the corporation.

14. It was apparently at this time that the management of Clark decided to actually try to get into the fleeting and switching business in the Baton Rouge Port. As previously shown, by this time, Cargo had been in the fleeting and switching business some two years, and was actually servicing practically all of the grain barges destined for the Cargill elevator. Clark, realizing that their location was not suitable for the fleeting and switching business, acquired, by lease, a location known as Red Dog Landing, which was located on east side of the River, across from the Cargill elevator. When Clark moved its operation from Devil's Swamp to Red Dog Landing, it resulted in the abandonment of its $98,000 investment in the Devil's Swamp location. In view of its extremely precarious financial situation at that time, the corporation could ill afford such an abandonment and ultimate loss. Clark actually transferred its operations to the Red Dog Landing location on September 6, 1961. This was the first date on which it was in a position to offer fleeting and switching services at a convenient location for the grain barges destined for the Cargill elevator.

15. After relocating at Red Dog Landing, Clark actively solicited fleeting and switching business from the various barge lines, and shortly after it commenced its operation at Red Dog Landing, Mississippi Valley Barge Line, one of the largest barge lines operating on the River, American Commercial Barge Line, another one of the largest barge lines operating on the River, Union Barge Line, and John I. Hay Barge Line, all transferred their fleeting and switching business to Clark Marine. This business remained with Clark Marine until it went into bankruptcy and ceased to do business. Up until this time, Baton Rouge Coal and Towing Company was fleeting most of the petro-chemical barges in the port, and Cargo was fleeting practically all of the grain barges in the port. Rather than compete with Cargo for the grain barges, Baton Rouge Coal and Towing Company voluntarily elected, from time to time, to charter or lease one or more of their boats to Cargo when additional help was needed by Cargo, at peak times, for the switching and fleeting of grain barges.

16. Despite the fact that Clark did, in fact, obtain some of this fleeting and switching business, it was, nevertheless, an unprofitable operation from its very commencement. As a matter of fact, the

evidence showed that if Clark had been given all of the fleeting and switching of grain barges in the harbor, it still would have lost money. Clark Marine was simply under-capitalized, poorly-operated and over-expensed.

17. After experiencing these heavy losses in the pursuit of their regular business, Clark Marine then attempted to go into the boat building business. Three boat building projects were then undertaken, and all three projects had to be abandoned after Clark suffered heavy losses before the jobs were any where near completion. On one of the hulls alone, which had a contract price of $52,500, costs of $83,798 were incurred by Clark prior to the abandonment of the job. Even on some of its cleaning and degassing projects, the costs were poorly estimated. On one particular job, in Mobile, which was supposed to have produced a handsome profit, the company ended up suffering a very severe loss instead.

18. The evidence in this case clearly shows that the fleeting and switching business in the Port of Baton Rouge was not sufficient to maintain two or more companies engaged in that business. If two or more companies were engaged in that business, it would be necessary for them to have other business activities, of a profitable nature, in order to survive. Clark Marine was not successful in any phase of its business activities.

19. On May 25, 1962, the same day that the present suit was filed, Clark Marine filed a Petition for Re-Organization Under Chapter X of the Bankruptcy Laws. This re-organization attempt was unsuccessful, and Clark Marine was, shortly thereafter, adjudged a bankrupt. Clark Marine now attempts to place all of the blame for their business failure on the respondents, contending that the respondents conspired to, and did in fact, monopolize the business of fleeting and switching grain barges in the Port of Baton Rouge to such an extent that it forced Clark Marine Corporation into bankruptcy. It is contended in their suit, and an attempt was made during the trial to prove, that these respondents obtained the business of fleeting and switching grain barges for Cargo by coercing and threatening the large barge lines doing business in the Baton Rouge Port. Clark contends that because of the fact that Cargill is in a position to contract out the shipping of grain from its elevator, that it was in a position to, and actually did, threaten the large barge lines with loss of business if they, in turn, did not allow Cargo to do its fleeting and switching in the Port of Baton Rouge.

20. These contentions by petitioner were in no way proved. There was no evidence of any kind introduced during the trial of this case which could even indicate that either Cargo or Cargill or the other two respondents in any way threatened or coerced barge lines into using the services of Cargo Carriers. On the contrary, the evidence was quite explicit, and proved without any doubt, that the transfer of business by most of these barge lines from Hutton, Baton Rouge Coal and Towing, and Louisiana Marine Service, was brought about by a widespread dissatisfaction with the service being rendered by those companies. Representatives of these barge lines testified that they expected better service from Cargo; that they got better service from Cargo; and that they were pleased with their choice. This Court therefore finds as a fact that there was absolutely no proof of threats, intimidation or coercion of any kind used by the respondents, or any of them, to either obtain or to maintain the business which they had at the time Clark Marine attempted to enter into the fleeting and switching business in the Port of Baton Rouge, nor was there any proof of any threats or coercion, or of any conspiracy to threaten or coerce anyone on the part of these respondents following the attempted entry of Clark Marine into the fleeting and switching business.

21. It is found by the Court, as a fact, that petitioner, Clark Marine, was in no way damaged by any illegal activities on the part of respondents while operating and doing business in the Port

of Baton Rouge. It is further found as a fact that the demise of Clark Marine as a business entity in the Port of Baton Rouge was brought about solely and entirely by its own under-capitalization and poor management rather than by any illegal acts on the part of these respondents.

22. It is found as a fact, from the evidence adduced in this case, that even though Cargo Carriers did acquire practically all of the fleeting and switching business in the Port of Baton Rouge insofar as grain barges are concerned, this business was acquired by them through good, sound, and legal business practices, rather than by any illegal acts on their part. Approximately 40 per cent of the grain barges which they fleet and switch are barges which they own and operate themselves. Even petitioner does not contend Cargo does not have a right to fleet and switch their own barges. The remainder of the grain barges which they handle in the Port of Baton Rouge, while making up the remainder of the total grain barge fleet, does not in any way involve the other cargo and petro-chemical barges fleeted and switched by others in the Port of Baton Rouge. The fact that American Commercial Barge Line, Mississippi Valley Barge Line, Union Barge Line, and John I. Hay Barge Line, constituting some of the largest barge lines operating on the River, switched their business from Cargo to Clark Marine, and that as a result thereof, their business relations with Cargo in no way deteriorated, very clearly indicates that these barge lines were free to place their business where they felt their interests could best be protected and promoted. The evidence clearly shows, by testimony from officials of all of the various barge lines, that they were completely and totally free to place their business where they saw fit, and that they felt under no compulsion of any kind to place their business with any particular fleeting or switching service.

23. When Clark Marine realized that they were not able to attract more of the fleeting and switching business, they apparently realized that there was not enough of this business to sustain two or three companies in the Port. Consequently, Clark Marine officials approached the Greater Baton Rouge Port Commission, challenging the right of Cargo or Cargill to engage in fleeting operations of any kind in the Port of Baton Rouge. On what grounds such a challenge was made is not clearly apparent from the evidence, but in any event, the evidence is clear to the effect that Clark Marine did approach the Greater Baton Rouge Port Commission, not for the purpose of trying to get a portion or fair share of this business, but for the express purpose of attempting to get the Port Commission to declare that Cargo must get out of the fleeting and switching business completely in the Port of Baton Rouge. The Port Commission refused to accede to these demands of Clark. Thus, Clark, on its own behalf, attempted to bring about a situation which would force all of the barge lines to bring their business to Clark, as the only remaining switching and fleeting operator in the Port. This attempt failed, and when the business remained "up for grabs", in free competition, Clark Marine was simply not able to survive.

## CONCLUSIONS OF LAW

1. This Court has jurisdiction over this matter, and venue is properly laid in the Eastern District of Louisiana, Baton Rouge Division, pursuant to the provisions of Title 15, U.S.C.A. § 1 et seq.

■ 2. The provisions of the antitrust laws applicable to this case, and the ones which petitioner alleges have been violated by respondents, are as follows:

Title 15, U.S.C.A. § 1:

"Every * * * conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal * * *."

Title 15, U.S.C.A. § 2:

"Every person who shall monopolize, or * * * conspire with any other person or persons, to monopolize

any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a misdemeanor * * *."

Title 15, U.S.C.A. § 15:

"Any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor * * * and shall recover threefold the damages by him sustained * * *."

Thus, it is necessary, in this case, for petitioners to prove, by a preponderance of the evidence, that the named respondents conspired to monopolize, or that they did in fact unlawfully monopolize a part of the trade or commerce here involved in the Port of Baton Rouge, and that as a result of such monopoly or conspiracy to monopolize, petitioner has been injured in his business and/or property.

■ 3. A plaintiff, in a triple damage action such as this, carries a heavy burden of proof, and the trier of facts must be solidly convinced that petitioner has proved its case by a preponderance of the evidence. Paramount Film Distributing Corp. v. Applebaum, 217 F.2d 101 (CA5 1954), cert. den. 349 U.S. 961, 75 S.Ct. 892, 99 L.Ed. 1284.

■ 4. Mere size of a company, without evidence of predatory practices aimed at competitors, is not unlawful. Under our free enterprise system, where competition is encouraged, the successful competitor must not be punished when he wins just so long as his business activities and his methods and means of competition have been lawful and not afoul of the antitrust laws. United States v. Aluminum Company of America, 148 F.2d 416 (CA2 1945). As was stated in G. & P. Amusement Co. v. Regent Theatre Company, 107 F.Supp. 453, 459, (ND Ohio 1952), aff'd 216 F.2d 749 (6th Cir. 1954), cert. den. 349 U.S. 904, 75 S. Ct. 579, 99 L.Ed. 1240:

"There is nothing inherently unlawful in the acquisition and retention of a great volume of purchasing power. It is only when that power is used in such a manner as to further an unlawful restraint of trade that the wielder of the power runs afoul of the Sherman Act."

■ 5. It is, of course, necessary to look at the manner in which a position of monopoly, if one exists, has been obtained. A position of monopoly, in itself, is not necessarily prohibited by the Sherman Antitrust Act. As was stated in United States v. E. I. DuPont de Nemours & Co., 118 F.Supp. 41, 214–215, (D.Del.1953), aff'd 351 U.S. 377, 76 S. Ct. 994, 100 L.Ed. 1264 (1956):

"The decisions stated a defendant may lawfully obtain a monopoly position if that position is 'thrust upon it'. Thus the right to normal growth and to enjoy the results of technical achievement and successful competition has been preserved. * * * The decisions, on the contrary, demonstrate, if the challenged position is acquired, as it has been in this case, by superior technical skill and effective competitive activity, the resulting power from that position does not establish monopolization within the meaning of the statute. * * * Even dissenting judges in this case recognize when 'size and power have been obtained by lawful means and developed by natural growth' a corporation having even 'a dominating place' is 'entitled to maintain its size and the power that legitimately goes with it, provided no law has been transgressed in obtaining it. * * *'"

■ 6. This Court concludes, as a matter of law, that the evidence adduced at the trial of this case clearly establishes that whatever superior position the respondents herein enjoy in the fleeting and switching business in the Port of Baton Rouge was acquired entirely by lawful means and by their application of superior technical skill and effective competitive activity, and that there is no showing of any kind in this case that respondents, or any of them, employed the use of co-

ercion, threats, or other unlawful means to acquire or maintain the business which they currently enjoy. Petitioner has likewise failed to prove any conspiracy on the part of these respondents.

7. This Court further concludes, as a matter of law, that from the evidence presented during the trial of this case, the business failure experienced by petitioner, Clark Marine, resulted from its own under-capitalization, poor management, and ineptness in the business in which it was engaged, and that petitioner was in no way injured or damaged by any illegal activities on the part of these respondents.

8. In accordance with the findings and conclusions herein set forth, the demands of petitioner must be denied and this suit dismissed at petitioner's cost. Judgment to be entered accordingly.