**I. HAAS TRUCKING CORP. et al.,**
**Plaintiffs,**

v.

**NEW YORK FRUIT AUCTION CORPO-**
**RATION and Auction Delivery Corpo-**
**ration, Defendants.**

**No. 73 Civ. 4046.**

United States District Court,
S. D. New York.

Oct. 10, 1973.

Slavin & Hersch, New York City, for plaintiffs; Gilbert M. Hersch, New York City, of counsel.

Cleary, Gottlieb, Steen & Hamilton, New York City, for defendants; James W. Lamberton, George Weisz, George J. Grumbach, Jr., New York City, of counsel.

MEMORANDUM

LASKER, District Judge.

I. Haas Trucking Corp. ("Haas"), L. J.M. Service Inc. ("LJM") and Heyer Forwarding Co. ("Heyer") are small family businesses which, for nearly fifty years, have served in the wholesale fruit and vegetable business either as "Forwarders" or "Loaders"—terms which are elaborated below. New York Fruit Auction Corporation ("Auction") has been in the business of auctioning fresh fruit and produce since 1933, located originally at railroad piers on the Hudson and, since May, 1971, because of the substantial demise of railroad operations, at new leased premises in Hunts Point, Bronx, New York.

The forwarders-loaders are independent contractors appointed by "receivers", who in turn act either as agents for growers and shippers or principals in the sale of wholesale fruit. The forwarders-loaders have always carried on their activities on the premises occupied by Auction: until May, 1971, at the railroad piers of which Auction was a permittee only, after that date and until September 17, 1973 at the Hunts Point facility which Auction controlled as lessee. Although in earlier times at least one other fruit auction company carried on business in New York, in the recent past Auction has been the only fruit auctioneer in the city.

On September 12, 1973, without consultation or notice to Haas, LJM and Heyer, Auction addressed a letter to them and the other companies then serving as forwarders or loaders advising the addressees that at the start of the next business week (September 17), forwarding and loading at Auction's premises would be performed exclusively by its new subsidiary, Auction Delivery Corporation ("Delivery"), and that other forwarders would no longer be allowed to perform such services on Auction's premises. The letter offered to employ the principals and employees of the forwarders and loaders.

On September 21, 1973, the plaintiffs instituted this suit for injunctive and declaratory relief and for damages, alleging that the defendants' actions violate Sections 1 and 2 of the Sherman Act (15 U.S.C. §§ 1 and 2) and Section 7 of the Clayton Act (15 U.S.C. § 18). Simultaneously, the plaintiffs moved for a temporary restraining order and a preliminary injunction restraining the defendants from interfering with the conduct of plaintiffs' business or barring them from access to the Hunts

Point facility. A temporary restraining order was granted pending disposition of this application for preliminary relief. An evidentiary hearing was held on October 1 and 2, 1973.

## I.

The function of a forwarder is to shepherd the fruit owned by the seller, or "receiver", from the time it is unloaded at Auction until, after sale, it is picked up from Auction's floor for the buyer. While forwarders are appointed or retained by the shipper (receiver), they are not paid by him, but rather by the buyer. The significance of this fact becomes apparent in the discussion that follows. In carrying out its role, the forwarder inspects the commodities, makes samples for examination by possible buyers (in this capacity it is known as a sampler or display agent), designates where boxes are to be stacked in accordance with Auction's catalogue provided for each sale by the auctioneer, receives records of the fruit sold from Auction personnel, and sees to it that the proper lots of fruit are picked up by the buyers by issuing a delivery ticket to the buyer which the latter signs as a receipt.

Loaders, like forwarders, are appointed by a shipper-receiver, but paid by the buyer. The job of a loader is physically to transfer packages or boxes of fruit, after sale, from the floor of the auction building to the tailgate of the buyers' (or buyer-hired) trucks.

While the functions of forwarder and loader are also performed—indeed, by the necessities of the industry *must* be performed—at other facilities for the sale of fruit, such as the Hunts Point wholesale fruit market, Auction is the only facility at which these functions are carried out by independent contractors such as Haas, LJM and Heyer.

The parties differ sharply as to whether the businesses of forwarding and loading require skill or expertise. Aside from the generalized opinion testimony of the principals of the plaintiffs that the jobs do require skill, and without denigrating the importance of the work to receiver, buyer and Auction, the evidence establishes that forwarding and loading do not demand expertise. Auction does not, of course, dispute the *importance* of the work. Indeed, as will be seen, it is precisely because it *does* regard the work as important that it claims to have been impelled to create its own service company to do the work properly. It is true that the job of sorting and sampling requires expertise, however, Auction has not, and does not propose to bar any of the plaintiffs from continuing this work on its premises or from continuing to truck shippers' goods to Auction or buyers' purchases from there. The value of such a continuing opportunity may be questionable, since the plaintiffs assert that their businesses would not be viable if they were no longer able to forward and load at Auction's premises.

Whatever the historic origin and justification for the forwarding-loading system we have described, Auction claims, and the evidence establishes, that by the time Auction took the action which is the subject of this suit, the old system was plagued with inefficiencies which adversely affected Auction's interests.

The first drawback to the system was the lack of accountability of forwarders and loaders. Although the forwarders' responsibility was to shepherd packages of fruit and release them to *buyers* by whom they were paid, the forwarders were accountable to their *receivers,* and the receivers were not motivated to assure the buyers rapid and accurate deliveries. The loaders, too, although appointed by receivers were paid by buyers for services performed for the latter. Since forwarders and loaders were paid on a per-package basis, there was a natural tendency for them to handle the most packages with the least men; a tendency which the buyers dependent on them had no power to correct, since the buyer had no power to choose his own forwarder or loader.

A second defect of the system was the lack of centralized control. The various forwarders and loaders competed with each other. They declined to share labor forces on Auction's premises, causing bottleneck delays which a centrally directed labor force could have overcome. That is, e. g., delays at the station of one checker-forwarder whose fruit was being claimed by buyers, could not be alleviated by assigning (as a single employer *could*) unoccupied personnel employed by other forwarders.

Furthermore, there was evidence that some checkers made deliveries of fruit to the wrong buyers and occasionally purposely switched fruit to favor particular buyers. The lack of centralized direction made it impossible to control these practices.

The cumulative effect of these deficiencies resulted in serious problems for Auction, including (1) the cost of correcting errors committed by forwarders and loaders, a cost which, in the recent past has run at the rate of $30,000 annually; (2) errors in bills from Auction caused by underlying mistakes of checkers or loaders have resulted in buyers' refusal to pay bills (or to pay them in full) which, in turn, brought about a sharp upturn in Auction's accounts receivables at this time of high interest rates. In August, 1973, "short" remittances were twice the previous month and amounted to $31,000; (3) buyers increasingly deserted Auction and instead bought from its competitors, the approximately 300 wholesale fruit merchants and jobbers doing business in the adjacent Hunts Point Wholesale Market. For example, in 1971, Auction handled 13,000 carlots or 12.5% of physical volume, (10% of dollar volume) of the New York fruit and vegetable business. Wholesalers, jobbers and chain store warehouses handled the remaining 87.5% physical (and 90% dollar) volume. In 1973, Auction's physical volume has dropped from 13,000 to 10,500 carlots, a slippage of 15% although total volume in New York has remained stable.

This statistical information is critical not only because it demonstrates that there were sound business reasons for Auction to take action to restructure its operations, but because the record establishes that Auction clearly competes with the wholesalers, jobbers and chain stores, and the relevant market includes all of them, and is not, as plaintiffs contend, restricted to the *auction* sale of fruit. Indeed, the plaintiffs' own witnesses testified that Auction's buyers also buy from wholesalers and jobbers, are certainly free to use them as alternate sources and that the various segments of the market are in sharp competition with each other.

■ Faced with these significant business difficulties and losses Auction determined to take control of forwarding and loading on its own premises. Although Auction obviously intended to increase its own *overall* profits by the reorganization, we do not find, and plaintiffs have failed to demonstrate by a preponderance of the evidence, that Auction intended to profit or profiteer separately from the forwarding and loading operations which it assumed. It is true that simultaneously with the changeover, Auction raised its *own* prior charge to the buyer of 10¢ per package to 20¢ per package, but we find credible the testimony of Auction's witnesses that, in light of the charges previously (but no longer) paid by the buyers to the forwarders and loaders, the actual increase to the buyer is only 1¢ per package and that this amount is a reasonable hedge against the unknown contingencies of an entirely new system.

## II.

The Court of Appeals of this Circuit has most recently articulated the standards for the issuance of a preliminary injunction as follows:

"We repeatedly have emphasized the heavy burden on a party seeking the extraordinary remedy of preliminary injunctive relief. The standard that has evolved is that the moving party

'assume[s] the burden of demonstrating *either* a combination of probable success and the possibility of irreparable injury *or* that [it has] raised serious questions going to the merits and that the balance of hardships [tips] sharply in [its] favor.' Stark v. New York Stock Exchange, 466 F.2d 743, 744 (2 Cir. 1972) (emphasis added); Checker Motors Corp. v. Chrysler Corp., 405 F.2d 319, 323 (2 Cir.), cert. denied, 394 U.S. 999, 89 S.Ct. 1595, 22 L.Ed.2d 777 (1969). We find that standard to be particularly appropriate here where there is a strong public interest in the outcome of the dispute. See, e. g., Gulf & Western Industries, Inc. v. Great`Atlantic & Pacific Tea Co., 476 F.2d 687, 693, 698–699 (2 Cir. 1973); Exxon Corp. v. City of New York, 480 F.2d 460, 464 (2 Cir. 1973)." Michael & Cynthia Pride v. The Community School Board, 482 F.2d 257 (2 Cir. 1973).

We conclude that the application of these standards requires the denial of a preliminary injunction in the present case.

*A. Probability of Success.* The plaintiffs have not demonstrated the probability of succeeding on the merits.

*(i) The Section 1 Claim.*

■ Plaintiffs' allegation that the defendants acted "in concert and conspiracy" (Complaint, Par. 10) is without merit. Joseph E. Seagram & Sons, Inc. v. Hawaiian Oke & Liquors, Ltd., 416 F.2d 71, 81 (9th Cir. 1969), cert. denied, 396 U.S. 1062, 90 S.Ct. 752, 24 L.Ed.2d 1003 (1870). For the purposes of Section 1, the two defendants must properly be regarded as a single entity—and therefore incapable, as a matter of law, of concerted activity, conspiracy or contracting with each other. The sole reasons for Auction's creation of Auction Delivery as a separate corporation were that the employees in each operation belong to separate unions and that they enjoy different fringe benefits. They are clearly parts of an integral operation, so unified that they cannot be regarded as separate in any but the most perfunctory and technical manner.

■ This determination alone might be dispositive of the Section 1 claim, but the claim fails also because plaintiffs have failed to show that Auction's restraint is "unreasonable" within the meaning of the Act. In judging its reasonableness we must consider the special facts of the business or industry, its history and economic evaluation and the "nature of the restraint and its effect, actual or probable". Board of Trade of the City of Chicago v. United States, 246 U.S. 231, 38 S.Ct. 242, 62 L.Ed. 683 (1918).

■ The forwarding system in which the plaintiffs claim an undivestible interest is itself a historical peculiarity over which Auction had no power of control until it moved to Hunts Point, since at its prior location it was only a permittee without the ability to deny access to its premises to forwarders or loaders. The lack of economic value of the old system is attested by the fact that no forwarders operate as independent contractors anywhere else in the country—whether at the five other auction companies or at wholesalers, jobbers or chain store warehouses. Faced with the genuine business problems resulting from a system which it had not created and over which it previously had no control, it was not unreasonable for Auction to adopt, for the purpose of maintaining its own customers, and with no predatory intent, a system universally used by its competitors.

The case is comparable to that of a manufacturer who permissibly assumes the distribution of his product formerly performed by an independent contractor. Bushie v. Stenocord Corp., 460 F.2d 116 (9th Cir. 1972); Ricchetti v. Meister Brau, Inc., 431 F.2d 1211, 1214 (9th Cir. 1970), cert. denied, 401 U.S. 939, 91 S. Ct. 934, 28 L.Ed.2d 219. Such decisions as United States v. St. Louis Terminal, 224 U.S. 383, 32 S.Ct. 507, 56 L.Ed. 810

(1912) and Gamco, Inc. v. Providence Fruit & Produce Bldg., Inc., 194 F.2d 484 (1st Cir. 1952), cert. denied, 344 U.S. 817, 73 S.Ct. 11, 97 L.Ed. 636 (1952) on which plaintiffs rely are not to the contrary since in those cases the defendants failed to justify their actions, evidence of predatory intent was clear and the persons excluded from the premises of the defendants were their own competitors, persons who performed the very central services performed by the defendants, not ancillary services such as those offered by plaintiffs here. None of those considerations exist in the case at hand.

The holding in Beacon Fruit & Produce Co., Inc. v. H. Harris & Co., Inc., 160 F.Supp. 95 (D.Mass.), aff'd, 260 F.2d 958 (1st Cir. 1958), cert. denied, 359 U.S. 984, 79 S.Ct. 942, 3 L.Ed.2d 933 (1959) applies. There the court found the imposition of a loading charge by the sole fruit auction company in the city to be reasonable since, as here, its action was prompted by requirements of survival. The court found there, as we do here, that fruit auctioneers were in direct competition with wholesalers and supermarket chains; that the auctioneers had for years been experiencing a serious decline in the volume of business; that the new arrangement was motivated by sound business needs and that the new system strengthened competition rather than weakening it. *See also* Clark Marine Corp. v. Cargill, Inc., 226 F.Supp. 103 (D.La.1964), aff'd, 345 F.2d 79 (5th Cir. 1965), cert. denied, 382 U.S. 1011, 86 S.Ct. 620, 15 L.Ed.2d 526 (1966).

*(ii)  The Section 2 Claim.*

■ Section 2 of The Sherman Act proscribes monopolization of or attempts to monopolize "any part of the trade or commerce among the several states". The phrase "any part of the trade or commerce" is construed by the Supreme Court and the Court of Appeals of this Circuit to mean an "appreciable part" of that trade. Times-Picayune Publishing Co. v. United States, 345 U.S. 594, 73 S.Ct. 872, 97 L.Ed. 1277 (1953); Lorain Journal Co. v. United States, 342 U.S. 143, 72 S.Ct. 181, 96 L.Ed. 162 (1951); United States v. Paramount Pictures, Inc., 334 U.S. 131, 68 S.Ct. 915, 92 L.Ed. 1260 (1948); H. E. Fletcher Co. v. Rock of Ages Corporation, 326 F.2d 13 (2d Cir. 1963). It is not probable that the activities here will be shown to constitute or affect an "appreciable part" of interstate trade or commerce.

■ The services of forwarding and loading are not characterized by the indicia of a market or a part of trade and commerce. They consist solely of checking off fruit, guarding it and moving it on the auctioneer's floor. Such services are nowhere else performed or "sold" by independent contractors. They do not constitute a part of trade and commerce within the meaning of the Act unless the services of a clerk or forklift operator do so; and however worthy such jobs may be, we do not believe they fall within Congress' definition for application of the statute.

Other expected market characteristics are notable by their absence. For practical purposes there is no interchange or competition among the forwarders or the loaders. Receivers are not motivated to choose among them (unless one of them goes out of business), since the receiver does not pay the forwarder or loader, and in any event, the price of the service is fixed and unvaried.

■ But beyond these factors we must consider whether the record indicates a likelihood of proving monopoly or an attempt to monopolize. We are persuaded that it does not. The relevant market here, defined in terms of available substitutes and cross-elasticity of demand for products (United States v. E. I. duPont de Nemours & Co., Inc., 351 U.S. 377, 393, 400, 76 S.Ct. 994, 100 L.Ed. 1264 (1956), is the wholesale distribution of fruit (Beacon Fruit & Produce Co., Inc. v. H. Harris & Co., Inc., *supra*). Auction's control of 10% of

that market is by definition no monopoly, and it is inconceivable that its assumption of forwarding and loading services on its own premises tends toward monopoly or constitutes an attempt to monopolize the wholesale fruit market.

The mere operation of the only fruit *auction* facility in New York does not render it a monopoly within the meaning of the statute where the auctioneer competes directly with others who control 90% of the industry's volume. (Beacon Fruit & Produce Co., Inc. v. H. Harris & Co., Inc., *supra*, Freedman v. Philadelphia Terminals Auction Co., 1957 Trade Cases ¶ 68,612 (E.D. Pa.1956) ).

*(iii)  The Section 7 Claim.*

Section 7 of the Clayton Act provides in relevant part:

"[That] no corporation engaged in commerce shall acquire . . . the assets of another corporation engaged also in commerce, where in any line of commerce in any section of the country, the effect of such acquisition may be substantially to lessen competition or to tend to create a monopoly."

Plaintiffs argue that the "line of commerce" appropriate to this case is their business of forwarding and loading. However that may be, since the concept "line of commerce" is equivalent to that of "part of trade or commerce" under § 2 of The Sherman Act (United States v. Grinnell Corp., 384 U.S. 563, 573, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966), we conclude, on the authority of the cases cited in reference to the § 2 claim above, that no "line of commerce" exists here within the meaning of § 7 of the Clayton Act. And, even if we admit that forwarding and loading constitute a line of commerce, the line is not "substantial" as is required by the decisions in United States v. E. I. duPont de Nemours, *supra*, and International Salt

Co. v. United States, 332 U.S. 392, 68 S. Ct. 12, 92 L.Ed. 20 (1947). The "line" consists of six forwarders and four loaders. Heyer pays its two principals $25,000. each per year but it is unclear what portion of these payments is attributable to its forwarding business as opposed to its market deliveries and "piggyback" trucking. LJM earned $31,000. in 1972. Haas' president was uncertain whether his company earned a profit or incurred a loss in 1971, 1972 or this year. His salary is $7,800. per year.

In Fortner Enterprises v. United States Steel Corp., 394 U.S. 495, 89 S.Ct. 1252, 22 L.Ed.2d 495 (1969), the court held that a "substantial market" must be one "substantial enough in terms of dollar volume so as not to be merely *de minimis*" (at 501, 89 S.Ct. at 1258). *See also* United States v. Yellow Cab Co., 332 U.S. 218, 225, 67 S.Ct. 1560, 91 L.Ed. 2010 (1947) and H. E. Fletcher Co. v. Rock of Ages Corp., *supra*. We do not believe that under the test of these cases plaintiffs will establish that the line of commerce here involved is "substantial".

*(iv)  The Tie-in Claim.*

Relying on such cases as Fortner Enterprises v. United States Steel Corp., *supra*, United States v. Loew's Inc., 371 U.S. 38, 83 S.Ct. 97, 9 L.Ed.2d 11 (1962), United States v. Jerrold Electronics Corporation, 187 F.Supp. 545 (E.D.Pa.1960), aff'd, 365 U.S. 587, 81 S.Ct. 755, 5 L.Ed.2d 806 (1961), Siegel v. Chicken Delight, Inc., 448 F.2d 43 (9th Cir. 1971) and American Mfrs. M. I. Co. v. American Broadcasting-Para. Th., 388 F.2d 272 (2d Cir. 1967), plaintiffs argue that Auction's assumption of forwarding and loading constitutes an illegal tie-in to its business of auctioning fruit. We cannot agree.

First, since the existence of a tie-in assumes two product or service markets, and since we have already held

that neither forwarding or loading constitutes a "market", the proof of a tie-in must fail. Furthermore, where, as in the wholesale fruit industry, services are traditionally sold as a unit, the seller—here Auction—is not obliged to offer the services piecemeal.

■ Second, to establish an illegal tie-in a plaintiff must demonstrate that the defendant possesses "sufficient economic power with respect to the tying product to appreciably restrain competition in the market for the tied product". Northern Pacific R. Co. v. United States, 356 U.S. 1, 6, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958). *See also* United States v. Loew's, Inc., *supra,* 371 U.S. at 45, 83 S.Ct. 97. Here Auction simply does not possess the requisite economic power in the wholesale fruit market of New York.

■ Third, even under *Fortner,* on which plaintiffs rely, the court held that to establish a tying arrangement as a *per se* violation, a plaintiff must prove that "a not insubstantial" amount of commerce in the tied service is involved. We have already held that this test has not been met in the present case.

### B. Irreparable Damage.

■ Each side argues that it will be irreparably damaged if the motion is decided against it. Since we have indicated that plaintiffs have not established the probability of their success on the merits, we need not determine whether they will be irreparably damaged by the denial of preliminary relief. Nevertheless, on examination, we think that they will not. There seems to be no dispute, and, in any event, we find that Auction will be able to meet such money damages as plaintiffs would be entitled to in the event they ultimately prevail. Where money damages are a dependable remedy, the "extraordinary" remedy of preliminary injunctive relief is inappropriate. Furthermore, we believe it entirely possible that if plaintiffs do ultimately prevail, the customers whom they allege to desire their assistance so earnestly, and some of whom testified to that effect, will resume the use of their services. We must consider, too, that, as defendant's Executive Vice President testified without contradiction at the hearing, Auction estimates that its losses would amount to $25,000. per month if it were further restrained from implementing its new system. Under the circumstances, we do not believe that the hardships placed on plaintiffs by denial of the motion, serious though they are, tip so decidedly in their favor that we should grant preliminary relief. Furthermore, although we are not unmindful of or unsympathetic to the social desirability of maintaining small family businesses intact in an economy in which the number of giants grow daily, we are bound by the rulings we have cited, and we cannot disregard the public's interest in rationalizing the practices of fruit auctioning so that competition within the wholesale fruit industry can be sharpened.

This opinion constitutes the findings of fact and conclusions of law required by Rule 52(a), Federal Rules of Civil Procedure.

The motion for a preliminary injunction is denied, and the temporary restraining order shall be dissolved within five days of the filing of this opinion, during which time the plaintiffs may make application to the Court of Appeals for further temporary relief pending the disposition of an appeal.

It is so ordered.