DIMMITT AGRI INDUSTRIES, INC., a Texas corporation, Plaintiff-Appellee,

v.

CPC INTERNATIONAL INC., Defendant-Appellant.

No. 80–2065.

United States Court of Appeals, Fifth Circuit.

July 2, 1982.

Opinion on Denial of Rehearing and Rehearing En Banc Oct. 12, 1982.

Baker & Botts, Theodore F. Weiss, Jr., Robert J. Malinak, Houston, Tex., for defendant-appellant.

Witherspoon, Aikin & Langley, James Witherspoon, Hereford, Tex., Joseph M. Alioto, Lawrence Appel, San Francisco, Cal., for plaintiff-appellee.

Before GEE, RUBIN and GARZA, Circuit Judges.

GEE, Circuit Judge:

This is an appeal from the district court's denial of the defendant's motion for judgment n. o. v. after a jury verdict of monopolization under the Sherman Act. Because we find that the section 2 monopolization verdict cannot, as a matter of law, stand, we reverse and remand for a new trial.

Sixty-six years ago, the United States charged a defendant, Corn Products Refining Company, with combining illegally in restraint of trade and monopolizing in violation of sections 1 and 2 of the Sherman Act.[1] Then District Judge Learned Hand, in an opinion long familiar to students of antitrust law, *United States v. Corn Products Refining Co.*, 234 F. 964 (S.D.N.Y. 1916), *appeal dism'd*, 249 U.S. 621, 39 S.Ct. 291, 63 L.Ed. 805 (1919) (hereinafter cited as *Corn Products*), found the defendant guilty of the various antitrust offenses alleged. Specifically, the court found that the defendant had combined into an organization that conspired to monopolize and restrict commerce in the manufacture and sale of starch, glucose, grape sugar, and various syrups by, inter alia, agreeing to sell the various products at unreasonably low fixed prices, thereby preventing new competitors from entering the field and driving out those already engaged in the business. The evidence of monopolizing intent presented to the court consisted of internal memoranda by the officers of the defendant company, acknowledging their belief that Corn Products Refining "had entire control over the price at which the product should be sold." *Id.* at 992. The court had this to say about the nature of such evidence:

The officers of the Corn Products Refining Company apparently had a custom of communicating with each other by typewritten, unsigned memoranda. Apparently it was often difficult for them to interview each other personally, and the affairs of the company were discussed between them by means of these memoranda with the utmost frankness. The documents were never intended to meet the eyes of any one but the officers themselves, and were, as it were, cinematographic photographs of their purposes at the time when they were written. They have, therefore, the highest validity as evidence of intention, and, although in many instances Bedford attempted to contradict them, his contradiction only served to affect the general credibility of his testimony. In the face of these memoranda, which for some strange reason were preserved, there can be no question in my mind of the continuous and deliberate purpose of the Corn Products Refining Company, by every device which their ingenuity could discover to maintain as completely as possible their original domination of the industry. That they recognized the impossibility of an absolute exclusion of other glucose and starch manufacturers is true enough, for they were minutely advised as to all conditions of the industry. But, while recognizing this inability, they in no wise conceded among themselves that their conduct could not have, and should not have, a depressing influence upon the growth of any competition. In considering the various devices adopted for that purpose, I shall paraphrase the memoranda in detail; but at the outset it is important to remember

1. 15 U.S.C. § 1 provides, inter alia:

    Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal. . . . Every person who shall make any contract or engage in any combination or conspiracy declared by sections 1–7 of this Title shall be deemed guilty of a misdemeanor, and, on conviction thereof, shall be punished by fine not exceeding $50,000, or by

imprisonment not exceeding one year, or by both said punishments, in the discretion of the court.

15 U.S.C. § 2 provides, inter alia:

    Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a misdemeanor . . . .

that permeating the whole of their conduct, certainly down to the year 1912, there runs the intent which I have mentioned, an intent the execution of which it is the precise purpose of the anti-trust act to foil.

*Id.* at 978.

Despite the passage of time (or perhaps because of it), the officers of Corn Products Refining, now CPC International Inc. ("CPC"), have not learned the perils of incriminating internal memoranda. Students of antitrust law may consequently be excused a feeling of déjà vu upon reading the facts in this case. This appeal grows out of a jury verdict finding section 2 Sherman Act monopolization in a private antitrust suit by Dimmitt Agri Industries, Inc. ("Dimmitt") against CPC. Dimmitt is a farmers' cooperative that constructed a corn wet milling plant in the Texas panhandle and, in late 1970, commenced the manufacture of cornstarch and, later, corn syrup. CPC, a Delaware corporation headquartered in New Jersey with production plants in various foreign countries, is the largest producer in the national corn wet milling market. In late 1972, Dimmitt was allegedly "forced out" of the corn wet milling market, and Amstar Corporation, the nation's largest sugar producer, took over operation of Dimmitt's plant in 1973. In 1974, Dimmitt sued CPC and others in the corn wet milling industry. All defendants except

CPC settled before trial. Dimmitt's allegations and causes of action against CPC are similar to those involved in the 1916 case discussed above. Dimmitt alleged five antitrust theories: (1) a price-fixing conspiracy under section 1, Sherman Act; (2) conspiracy to monopolize, (3) attempt to monopolize, (4) monopolization, all under section 2, Sherman Act; and (5) illegal price discrimination under the Robinson-Patman Act.

The factual record, developed in the course of an eight-week trial before a jury, was extensive. Thousands of pages of documentary exhibits were introduced, and 35 witnesses testified, either personally or by deposition. Despite the nearly 6,000-page transcript of proceedings, the underlying theory of plaintiff Dimmitt's case was straightforward and strikingly similar to that of the 1916 proceeding: essentially, Dimmitt alleged that CPC fixed unreasonably low prices in order to exclude competition, especially Dimmitt, from the national markets for cornstarch and corn syrup. Like the government in 1916, Dimmitt purported to demonstrate its case through the defendant's own incriminating internal memoranda, and, as in the earlier proceeding, the tactic proved ultimately successful. The case was submitted to the jury on special interrogatories on all five antitrust theories.[2] The jury found for CPC on all theories except the crucial monopolization claim. It found that "during the relevant

2. The text of these interrogatories, along with the jury's answers to each, were as follows:

INTERROGATORY NO. I

(a) Do you find from a preponderance of the evidence that, during the relevant time period, the defendant CPC combined or conspired to fix prices in violation of Section 1 of the Sherman Act?

Answer: "Yes" or "No"
ANSWER: No

If you have answered (a) above "Yes," then answer (b) and (c); otherwise do not answer (b) and (c).

(b) Do you find from a preponderance of the evidence that such violation of CPC was a proximate cause of injury or damage to the business or property of Dimmitt Agri?

Answer: "Yes" or "No"
ANSWER: _____

(c) Do you find from a preponderance of the evidence that such violation of CPC was a proximate cause of injury or damage to the business or property of DIMACO?

Answer: "Yes" or "No"
ANSWER: _____

INTERROGATORY NO. II

(a) Do you find from a preponderance of the evidence that, during the relevant time period, the defendant CPC monopolized a relevant market in violation of Section 2 of the Sherman Act?

Answer: "Yes" or "No"
ANSWER: Yes

If you have answered (a) above "Yes," then answer (b) and (c); otherwise do not answer (b) and (c).

(b) Do you find from a preponderance of the evidence that such violation of CPC was a proximate cause of injury or damage to the business or property of Dimmitt Agri?

Answer: "Yes" or "No"
ANSWER: Yes

(c) Do you find from a preponderance of the evidence that such violation of CPC was a proximate cause of injury or damage to the business or property of DIMACO?

time period, the defendant CPC monopolized a relevant market in violation of Section 2 of the Sherman Act" and that this violation was a proximate cause of injury to Dimmitt's business. The court trebled the damages awarded by the jury and added attorneys' fees. Judgment for Dimmitt was entered for $5.3 million.

> Answer: "Yes" or "No"
> ANSWER: No
> INTERROGATORY NO. III
> (a) Do you find from a preponderance of the evidence that, during the relevant time period, the defendant CPC attempted to monopolize a relevant market in violation of Section 2 of the Sherman Act?
> Answer: "Yes" or "No"
> ANSWER: No
> If you have answered (a) above "Yes," then answer (b) and (c); otherwise do not answer (b) and (c).
> (b) Do you find from a preponderance of the evidence that such violation of CPC was a proximate cause of injury or damage to the business or property of Dimmitt Agri?
> Answer: "Yes" or "No"
> ANSWER: _____
> (c) Do you find from a preponderance of the evidence that such violation of CPC was a proximate cause of injury or damage to the business or property of DIMACO?
> Answer: "Yes" or "No"
> ANSWER: _____
> INTERROGATORY NO. IV

(a) Do you find from a preponderance of the evidence that, during the relevant time period, the defendant CPC combined or conspired to monopolize a relevant market in violation of Section 2 of the Sherman Act?
Answer: "Yes" or "No"
ANSWER: No
If you have answered (a) above "Yes," then answer (b) and (c); otherwise do not answer (b) and (c).
(b) Do you find from a preponderance of the evidence that such violation of CPC was a proximate cause of injury or damage to the business or property of Dimmitt Agri?
Answer: "Yes" or "No"
ANSWER: _____
(c) Do you find from a preponderance of the evidence that such violation of CPC was a proximate cause of injury or damage to the business or property of DIMACO?
Answer: "Yes" or "No"
ANSWER: _____

> INTERROGATORY NO. V
> (a) Do you find from a preponderance of the evidence that, during the relevant time period, the defendant CPC discriminated in prices in violation of Section 2(a) of the Robinson-Patman Act?

CPC's appeal focuses on one crucial distinction between the 1916 proceeding and the litigation here. Much of that earlier case was devoted to evidence of the market share in the glucose and starch trade controlled by Corn Products Refining Company.[3] In the proceedings under review here, the parties did not focus on market share.

> Answer: "Yes" or "No"
> ANSWER: No
> If you have answered (a) above "Yes," then answer (b) and (c); otherwise do not answer (b) and (c).
> (b) Do you find from a preponderance of the evidence that such violation of CPC was a proximate cause of injury or damage to the business or property of Dimmitt Agri?
> Answer: "Yes" or "No"
> ANSWER: _____
> (c) Do you find from a preponderance of the evidence that such violation of CPC was a proximate cause of injury or damage to the business or property of DIMACO?
> Answer: "Yes" or "No"
> ANSWER: _____
> If you have answered "Yes" to one or more Interrogatories Nos. I(b), II(b), III(b), IV(b), or V(b), then answer the following Interrogatory; otherwise, do not answer Interrogatory No. VI(a).
> INTERROGATORY NO. VI(a)
> What sum of money, if paid now in cash, do you find from a preponderance of the evidence would fairly and reasonably compensate Dimmitt Agri for the damage to its business or property which you have found was proximately caused by conduct of defendant in violation of the antitrust laws.
> ANSWER IN DOLLARS AND CENTS, IF ANY:
> $1,500,000.00
> If you have answered "Yes" to one or more Interrogatories Nos. I(c), II(c), III(c), IV(c), or V(c), then answer the following Interrogatory; otherwise, do not answer Interrogatory No. VI(b).
> INTERROGATORY NO. VI(b)
> What sum of money, if paid now in cash, do you find from a preponderance of the evidence would fairly and reasonably compensate DIMACO for the damage to its business or property which you have found was proximately caused by conduct of defendant in violation of the antitrust laws.
> ANSWER IN DOLLARS AND CENTS, IF ANY:

---

3. Thus, the New York district court noted that at a low point in the defendant's control, the "percentage of total glucose production, domestic and foreign, attributable to the defend-

The limited amount of documentary evidence presented suggests that during 1971 and 1972, the time period in which Dimmitt was competing in the corn wet milling industry, CPC's maximum possible market shares in the narrowest markets alleged by Dimmitt were: 25 percent in the national cornstarch market and 17 percent in the national corn syrup market. The narrow issue presented for our review, as stated in defendant's judgment n. o. v. motion, is whether a defendant with such a low market share can, "as a matter of law, have monopoly power, the essential prerequisite for a jury finding of monopolization."

## I. PROPERLY RAISED?

■ At the outset, we are met by Dimmitt's contention that CPC's "market share" argument is not properly before us because it was not raised in CPC's earlier motion for directed verdict. Under Fed.R. Civ.P. 50(a), "[a] motion for directed verdict shall state the specific grounds therefor." If a motion for directed verdict is denied, a party may move within ten days after entry of judgment "to have the verdict in any judgment entered thereon set aside and to have judgment entered *in accordance with his motion for a directed verdict . . . .*" Fed.R.Civ.P. 50(b) (emphasis added). The law on point is well established:

A motion for judgment notwithstanding the verdict, like a motion for directed verdict, must state the grounds on which it was made. Since it is technically only a renewal of the motion for directed verdict made at the close of the evidence, it cannot assert a ground that was not included in the motion for a directed verdict.

Wright & Miller, *Federal Practice & Procedure: Civil* § 2537 (1971) (footnotes omitted). *Accord Sulmeyer v. Coca Cola Co.,* 515 F.2d 835, 846 (5th Cir. 1975), *cert. denied,* 424 U.S. 934, 96 S.Ct. 1148, 47 L.Ed.2d 341 (1976); *House of Koscot Development Corp. v. American Line Cosmetics, Inc.,* 468 F.2d 64, 67–68 (5th Cir. 1972).

In this case, CPC's motion for directed verdict alleged, inter alia, that: "with respect to monopolization there is no evidence that CPC possessed monopoly power in any relevant market, much less that CPC deliberately acquired or maintained such power." CPC's subsequent j. n. o. v. motion is, in our view, only a more detailed version of this "no evidence of monopoly power" ground for vacating the verdict. CPC's motion for j. n. o. v. stated, inter alia:

A defendant with a market share of no more than 21 percent cannot, as a matter of law, have monopoly power, the essential prerequisite for a jury finding of monopolization. In other words, whatever other evidence of monopoly a plaintiff may have, a defendant cannot possibly, as a matter of law, "control prices or exclude competition" if its market share is as low as CPC's position in this case.

It requires no great familiarity with the law of antitrust to know that evidence of a defendant's market share is the principal tool used by courts to determine the existence of monopoly power. While a j. n. o. v. motion may not enlarge or assert new matters not presented in the motion for directed verdict, "technical precision is not necessary in stating the grounds for the motion [for directed verdict] so long as the trial court is aware of the movant's position." *United States v. Fenix & Scisson, Inc.,* 360 F.2d 260, 266 (10th Cir. 1966), *cert. denied,* 386 U.S. 1036, 87 S.Ct. 1474, 18 L.Ed.2d 599 (1967). Here there is no doubt that the trial court was aware of the movant's position, since CPC raised its market share contention in its objections to the jury charge. The rationale for the rule that a motion for j. n. o. v. cannot assert a ground not included in a motion for directed verdict is obviously to avoid "ambushing" the trial court and opposing counsel. *Quinn v. Southwest Wood Products, Inc.,* 597 F.2d 1018, 1025 (5th Cir. 1979). Since no such "sandbagging" was possible here, we conclude that

ant Corn Products Refining Company" was, in 1913, only 57% and, in 1914, 53%. 234 F. at 974. The defendant's percentage of grape sug-

ar was over 90% in 1914, and its share of starch production was 58% in 1914. *Id.* at 975.

the merits of CPC's contentions on appeal are open for our review.

## II. EVIDENCE OF MONOPOLIZATION.

Dimmitt's monopolization case against CPC was built around a series of CPC memoranda, many of which were stamped "confidential" and were between the highest corporate officials of that company. According to Dimmitt's theory of the case, CPC was, during the period 1970–72, "able to maintain and exercise the ability to control prices in and exclude competition from the cornstarch and corn syrup markets."

CPC, burdened with generally outmoded physical plants, was, according to a 1970 memorandum by its president, concerned with the possibility of competition by modernized cooperatives. These cooperatives, free of the burdens of some of the taxes faced by ordinary industrial concerns, could, CPC feared, produce a "higher quality product at lower cost." According to Dimmitt, its completely automated plant in the Texas panhandle was the main object of CPC's concern. Thus, in 1968 Plimpton, then president of CPC, sought to "kill" the Dimmitt project by "spread[ing] the word that we would certainly consider reducing our price as much as 50–75 cents per cwt. to defend this market [paper industry, starch market on the West Coast]." This threatened price cut was discussed when CPC visited International Paper, a potential Dimmitt customer for cornstarch, and announced that CPC would "probably assume pricing leadership in the starch market in the near future." Thereafter, coincidentally on December 1, 1970—the anticipated date of Dimmitt's market entry—CPC announced a new pricing policy for its mill-grade starch. Under this new "spot pricing," with an avowed purpose of stabilizing prices, CPC would no longer attempt to relate its cornstarch prices strictly to market fluctuations in the price of corn. At the same time, CPC lowered its cornstarch prices sold to the paper trade by a full 75 cents per hundredweight (cwt). By September 1971, apparently concerned with the threat of other farmer cooperatives following Dimmitt's lead, CPC memoranda were frankly acknowledging the need to "plan the marketing attack in order to discourage competitors from constructing new plants." In December 1971, the "CPC International Industrial Division Strategy Report" stated that CPC would "control competitors' share of market," "maintain position as the recognized price leader of the industry," and that, as a matter of policy:

> Price will be used primarily as a tool to reach or to maintain market share goals and to control and influence competitors' investment and growth. Price strategies will be directed toward long-term strength of position as a clear priority over short-term profitability.

According to CPC itself, the cornstarch "spot pricing" program "allows upsetting or stabilization of the market place at our discretion." The losses incurred as a result of the reduction in spot-grade starch prices were acknowledged in later CPC memoranda, along with assumed consequent difficulties for smaller competitors. Despite these losses and the then-soaring corn costs, by November 1971 CPC had cut its April 1971 price by a full $1.25 per hundredweight.

Dimmitt's memoranda evidence presents a similar scenario in the corn syrup market. Again CPC memoranda repeatedly refer to "price leadership" and "stabilization" of the corn syrup market. The thrust of Dimmitt's case was convincingly built around CPC memoranda that described its intentions in unmistakeable terms:

> The purpose of stabilizing the corn syrup market is admirable .... [S]everal years ago this same approach was tried and CPC reduced and market price of corn syrup to $4.00 base. All competitors promptly followed but we did not stay with the idea more than a few weeks when we began to raise prices again. This was the mistake.
>
>     \*      \*      \*      \*      \*      \*
>
> If we accept the new plan we must realize that we can go into a negative profit situation for an extended period of time .... I am sure that all competition will announce new market policies within a few hours after our announcement.
>
>     \*      \*      \*      \*      \*      \*

Mr. Fox's plan to establish pricing leadership and to stabilize the corn syrup market is a noble one indeed . . . . How low would we have to go to reach bottom? $4.00 to $4.50/cwt. which would be difficult in that our competitors have newer equipment with higher efficiency and lower selling costs.

\*   \*   \*   \*   \*   \*

In theory and principle I agree with your proposal to establish pricing leadership and to stabilize the corn syrup market. As long as there is excess production and we continue our present policy of meeting competition, we will continue to be "whip sawed" by both competitors and buyers with the result of much lower margins and the survival of the fittest. . . . What I am saying is that once we start on this program, we must be prepared to go substantially lower before our competitors and customers fully understand that we are determined to be the price leader. If all levels of management are not willing to accept the consequences and pay the price then I think it would be advisable to use a different approach. . . . How far to "bottom"—I don't know but the saying "water seeks its own level" could be true in this case with the syrup producers taking a real bath before the desired discipline is reached.

Shortly after Dimmitt began production of corn syrup, CPC lowered its corn syrup prices. Eventually the corn syrup price went from $6.05 per cwt. to $3.40 per cwt., a price that, at least according to Dimmitt's expert, was below CPC's total and average variable costs.

Dimmitt produced other evidence of CPC's pricing strategy, including testimony by competitors that they regarded CPC as the price leader. The memoranda evidence of 1972, including one memo of November 6, 1972, after the CPC leadership learned that the Dimmitt plant had been taken over by Amstar, supports the view that at least the CPC leadership believed that its price strategy was successfully excluding competition from the market. Dimmitt's post-November 1972 memoranda evidence was especially damning to CPC's case. Thus, CPC's "corn syrup pricing program," announced November 1, 1972, stated:

OBJECTIVES

Provide leadership to market by (1) establishing a "climate" conducive to following CPC, and (2) setting a pricing pattern that can be easily understood, followed and monitored.

Establish climate by recognizing realistic base price.

Pre-announced price for specified periods.

Deterrent to not following is implied; return to November-December levels if we are undercut.

Lead industry to more reasonable returns, and prevent extended price commitments and/or confusion that preclude the opportunity for increases during capacity season (June-October).

Obtain for CPC the price leadership rewards of timing and the setting of price levels.

IMPLEMENTATION

1. Immediately announce "period" pricing per attached ($3.40/cwt. day to day) effective November 1, 1972.

. . . .

3. In approximately ten days announce price for period January ($3.80 per cwt.). Drop if necessary to maintain orderly market (and share).

4. Price in one or two month periods, aiming toward $4.75/cwt. period price for tight supply/high volume months (June-October).

ALTERNATIVES CONSIDERED

. . . .

3. Do nothing at this time. Rejected because competitors are anxious to know CPC's position and are looking to CPC to set 1973 tone. If we don't move, current $3.40 prices will start being extended into 1973.

This announcement of policy preceded a price increase in corn syrup that, in the eyes of CPC, was "being followed by the other suppliers."

Dimmitt's case culminates with a March 21, 1973, report by Eiszner, president and chief operating officer of CPC, to CPC's board of directors:

As you recall, we finally brought [corn syrup] prices down to the $3.40 per cwt. level [in 1972] in an effort to convey the message to the industry that we were no longer going to give up market share to competitors who cut price. Our sales plan for 1973, simply stated, was to re-establish our leadership position in corn syrup, to gradually increase prices as long as there was no sign of price cutting. . . .

To set the scene for this 1973 marketing plan, we raised the price of corn syrup in December 1972, from $3.40 to $3.80 per cwt. The industry followed our pattern. No one played price cutter, and we held market share. On February 1 of this year, we again raised corn syrup prices to $4.30 per cwt. The industry followed, nobody shaded the price, and we held market share.

Staley, Cargill, Corn Sweeteners, all have announced price increases to $4.65, to take effect March 30 of this year. We are following. Our plan is to either lead or follow price advances, up to the level at which new investment becomes economic. We will keep the price just below the new investment level until we are sold out. In the event anyone undercuts the list price, I have instructed our people to reduce prices, promptly and severely.

There was a major celebration in our shop in February, when the product manager for corn syrup announced that we had a 27 cents per cwt. gross margin on corn syrup—the first time the number had been in the black in a year. Gentlemen, we are making progress.

4. Yet Dimmitt accomplished this more than once over the course of trial, especially during its cross-examination of Eiszner, the president of CPC. To cite but one example:

Q .... You had the policy to conduct your marketing strategy in order to prevent the construction of new plants; is that right?
A Construction or expansion of new plants, sir.

In view of the incriminating nature of the memoranda evidence presented, Dimmitt can, with some justice, claim to have presented one of the clearest conduct evidence cases supportive of a monopolizing intent that has been presented to a court, possibly since *Corn Products* itself. Antitrust cases in which the plaintiff elicits admissions by the alleged monopolist that the company was out to exclude other competitors from the market are rare.[4] As in *Corn Products*, CPC's defense at trial to the monopolization claim was to attempt to cast its memorandum statements in a different light.

Especially through the testimony of Eiszner, CPC attempted to prove that it was, during all relevant times, simply trying to compete, "fair and square," with all of its competitors, including Dimmitt, in the midst of a ferocious price war. Accordingly, Eiszner testified that his pricing policies and motives had nothing to do with Dimmitt, that CPC's spot-price policy was a nonsinister method of changing the price of the product without regard to the cost of corn adopted in order to compete with larger producers unwilling to follow CPC's price decline, and that the various pricing strategies discussed by CPC executives involving Dimmitt and other potential farmer cooperatives were simply "what if" hypotheses that were never put into effect. In general, CPC witnesses testified that their motives throughout were simply to hold onto their own market share and that CPC was compelled by competitors and overproduction in the industry to take prices down. In addition, CPC attempted to portray Dimmitt's entry into the market as a poorly conceived move, doomed to failure from the start as the small company found itself in the midst of a highly competitive market "fueled by overcapacity in the industry."

Q Right?
A We did not want new plants built before we could sell our capacity, sir; yes, sir.
Q Right. And South Carolina was one of those that you wanted to prevent?
A I would just as soon it didn't go ahead, sir. I don't deny that.

Since most of Dimmitt's evidence consisted of memoranda among highly placed CPC personnel, CPC's closing argument to the jury was understandably pitched at the credibility of its witnesses, all of whom tried to distance themselves from their memoranda statements. Counsel for CPC thus attempted to make the case turn on the jury's view of the credibility of Eiszner:

> They are still out there in the market place fighting for their lives, and they are competing. They are competitors. And if you don't—if you think that Jim Eiszner is a price fixer, so be it.

> You saw him. Do you think Jim Eiszner is a price fixer? That's your question to answer. Do you think Jim Eiszner is a monopolist? That's your question to answer. Do you think he attempted to monopolize? Do you think he attempted to discriminate against prices to get Dimmitt?

As in *Corn Products*, testimony by company executives attempting to contradict their memoranda statements "only served to affect the general credibility of [their] testimony." 234 F. at 978. The jury chose to believe the evidence of the memoranda, as interpreted by Dimmitt, over the live testimony of Eiszner at trial and found CPC guilty of monopolization.

On appeal, Dimmitt's theory of the case remains unchanged, but appellant CPC raises a proposition largely ignored in the proceedings below: assuming the CPC memoranda proved the company's monopolizing intent, did Dimmitt nonetheless present sufficient evidence, or indeed any evidence, that CPC actually possessed monopoly power in either the national corn syrup or national cornstarch markets during 1971–72? In short, was there any evidence presented to the jury to demonstrate that, regardless of the assumptions held by CPC management about their power to control prices and exclude competitors, CPC in reality possessed monopoly power during this period? This is the sole issue presented to us for review.

## III. THE LAW AGAINST SECTION 2 MONOPOLIZATION.

Monopoly power is "the power to control price or exclude competition." *United States v. E. I. du Pont de Nemours & Co.*, 351 U.S. 377, 391, 76 S.Ct. 994, 1004, 100 L.Ed. 1264 (1956). The essence of the completed monopolization offense under section 2 involves two elements: capacity and deliberateness. The section 2 plaintiff must demonstrate "(1) the possession of monopoly power in the relevant market, and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *United States v. Grinnell Corp.*, 384 U.S. 563, 570–71, 86 S.Ct. 1698, 1703–04, 16 L.Ed.2d 778 (1966); *Woods Exploration & Producing Co. v. Aluminum Co. of America*, 438 F.2d 1286, 1304 (5th Cir. 1971), *cert. denied*, 404 U.S. 1047, 92 S.Ct. 701, 30 L.Ed.2d 736 (1972). The attempt offense also has two elements: "(1) specific intent to accomplish the illegal result; and (2) a dangerous probability that the attempt will be successful." *Spectrofuge Corp. v. Beckman Instruments, Inc.*, 575 F.2d 256, 276 (5th Cir. 1978), *cert. denied*, 440 U.S. 939, 99 S.Ct. 1289, 59 L.Ed.2d 499 (1979). In our court a section 2 plaintiff attempting to prove either completed monopolization or attempt must provide the jury with sufficient evidence to permit it to define the relevant geographic and product market. *Id.* at 276, 284–86; *In re Municipal Bond Reporting Antitrust Litigation*, 672 F.2d 436, 441 (5th Cir. 1982). The rule requiring proof of relevant market has been recognized by the Supreme Court. *Walker Process Equipment, Inc. v. Food Machinery & Chemical Corp.*, 382 U.S. 172, 177, 86 S.Ct. 347, 350, 15 L.Ed.2d 247 (1965). Proof of the relevant market in attempt cases is required in connection with the dangerous probability of success element of the attempt offense. Thus, courts often state the "dangerous probability" and "relevant market" requisites as one combined requirement of "establishing a dangerous probability of monopolization in a relevant market."

Annot., 27 A.L.R.Fed. 762, 768 (1976); *Spectrofuge*, 575 F.2d at 286.[5]

This court's insistence on proof of a relevant market is an outgrowth of the structural analysis, dependent on a showing of high market share in a relevant geographic-product market that has been consistently applied to monopoly cases since *United States v. Aluminum Co. of America*, 148 F.2d 416 (2d Cir. 1945) (hereinafter cited as *Alcoa*). Ever since this case, the most heavily contested issues in monopoly cases have typically revolved around the definition of relevant geographic or product market. Appellant here argues that demonstration of a high market share has now become the *exclusive* way of proving the completed monopolization offense. We find appellant's argument unnecessarily overbroad.

Structural analysis, along with the notion that a 90 percent or higher market share in a relevant market creates a presumption of monopolization was developed in *Alcoa* as a shortcut formula to demonstrate power to control prices or exclude competition. The early monopolization cases were not as concerned with high market share but dealt with monopolization claims on the basis of predatory exercise of market power.[6] The government in early cases, such as *Standard Oil Co. v. United States*, 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619 (1911); *United States v. American Tobacco Co.*, 221 U.S. 106, 31 S.Ct. 632, 55 L.Ed. 663 (1911); *United States v. American Can Co.*, 230 F. 859 (D.Md.1916), *appeal dism'd*, 256 U.S. 706, 41 S.Ct. 624, 65 L.Ed. 1181 (1921), attempted to demonstrate the actual exercise of market power to control prices or exclude competitors. The completed monopolization offenses in these early cases were largely based on what today we would call conduct analysis. These early cases viewed, for example, tortious attacks or threats on property, discriminatory price cutting, and sales by a vertically integrated firm at excessively high prices as predatory prices evidencing both elements of the completed monopolization section 2 offense. The modern cases do not explicitly overrule these early cases' approach; structural analysis, because it is "more objective" and easier to demonstrate, has merely displaced conduct analysis in proving the first element of the section 2 offense.[7]

Contrary to the appellant's contentions, this case is not one in which there was insufficient evidence of relevant market presented such as to be in violation of our rule in *Spectrofuge*.[8] In these proceedings

---

**5.** Some cases in the Ninth Circuit have, however, questioned the requirement of proof of relevant market in attempt cases. Annot., 27 A.L.R.Fed. at 768; *see, e.g., Forro Precision, Inc. v. IBM Corp.*, 673 F.2d 1045, 1059 (9th Cir. 1982); *Lessig v. Tidewater Oil Co.*, 327 F.2d 459, 474 (9th Cir.), *cert. denied*, 377 U.S. 993, 84 S.Ct. 1920, 12 L.Ed.2d 1046 (1964).

**6.** To some extent, *Corn Products* reflects this approach.

**7.** Thus, a basic antitrust hornbook states:
Justice White asked few instrumental questions [in *Standard Oil v. United States*]; his inquiry was sharply focused on whether power over price existed and was being exercised. It did not matter to him that the share of the crude market controlled by the combination was exceedingly small, since it appeared that power over crude prices was exceedingly large. Today, with elaborate theoretical tools for analyzing power, courts have developed a set of instrumental issues. They ask not the ultimate question, does the firm have power?, but a series of subsidiary ones like, what market does the firm engage in?, what is its share of that market?, are there entry barriers?, and the like. These instrumental inquiries are of true worth only in such degree as they throw light on the ultimate issue. Sometimes, however, they get in the way. They are allowed to block off appropriate responses toward which a more direct concern with power, such as that shown in *Standard Oil*, would lead.

. . . .

Market definition is not a jurisdictional prerequisite, or an issue having its own significance under the statute; it is merely an aid for determining whether power exists

. . . .

Sullivan, *Antitrust* at 38, 41 (1977).

**8.** In *Spectrofuge*, 575 F.2d at 286, we held that:
[T]here was insufficient evidence to support the jury's implicit finding that Beckman monopolized or attempted to monopolize a market comprised of the servicing of Beckman's scientific instruments or the submarket comprised of servicing its ultra-centrifuges. There was simply no evidence from which the jury could begin to measure Beckman's

there was compliance with our circuit's rule to provide sufficient evidence to define a relevant geographic and product market. The geographic market, national in scope, was the subject of stipulation by the parties. The relevant product market was a "contested fact issue" at trial, and Dimmitt unsuccessfully attempted to present certain evidence of CPC's alleged power in the levulose market as well as in the corn syrup and cornstarch markets. The court, however, excluded evidence pertaining to the levulose market, and Dimmitt's entire case thereafter focused on CPC's actions in the corn syrup and cornstarch markets and these actions' effects on Dimmitt's sale of corn syrup and cornstarch products. Hoyt, Dimmitt's consulting economist, testified as to the nature of these markets during the relevant years, and Dimmitt's memorandum evidence strongly indicates that CPC executives regarded their corn syrup and corn-

starch products as recognizably distinct national markets. In addition, minutes of a September 1971 meeting of the "industrial council," as well as the testimony of Eiszner himself, presented the jury with evidence as to CPC's market shares in these two markets in 1971–72.[9]

This is not a case, therefore, in which a jury was asked to find monopolization on the basis of conduct evidence alone. We therefore do not attempt to resolve the issue of whether, after *Alcoa* and its progeny, conduct analysis (e.g., evidence of a company's predatory acts on competitors), *in the absence of any evidence of high market shares*, can ever make out a monopoly case. The question here is narrower: can conduct evidence, belied by undisputedly low market shares in the relevant markets, make out a completed monopolization offense?[10]

power to control prices or to exclude competition in the relevant market defined by Specterfuge.

9. The minutes from the industrial council gave the following information on CPC's market shares:

Starch   Market share goal:   25%
   Present market share:   21% (September 1971)
   Historical market share:   27%
Corn syrup   Market share goal:   17–18%
   Present market share:   16%

At trial, Eiszner testified that in 1970 CPC's share of the market for mill-grade cornstarch was between 21 and 25 percent and that the figure for 1971 was in the same range, but he believed it was lower than in 1970. Eiszner estimated that in 1972 CPC's share of the mill-grade cornstarch market was "back up to about 25%." With respect to syrup, Eiszner testified that according to his best estimates CPC's market share was between 16½ and 17 percent in 1970, between 15½ and 16½ percent in 1971, and "around 14%" in 1972. Finally, Eiszner testified that since 1971 CPC's share of the national corn syrup market had dropped and had never reached 18 percent.

After review of the trial record, we agree with appellant's statements that CPC's maximum possible market shares in the narrowest markets alleged by Dimmitt, consistent with the evidence, were: 25% in the national cornstarch market and 17% in the national corn syrup market.

10. A similar question was raised but never resolved in *Fulton v. Hecht*, 580 F.2d 1243, 1246–

47 (5th Cir. 1978), *cert. denied*, 440 U.S. 981, 99 S.Ct. 1789, 60 L.Ed.2d 241 (1979), where the plaintiff alleged that defendant had a monopoly over the South Florida greyhound racing industry. The defendant controlled 25% of this market, "since it shares the South Florida dog track market with three other tracks which are, generally speaking, allocated an equal number of racing days per year." *Id.* at 1246. As in this case, the plaintiff argued that "market share is not the determinative factor in assaying the existence of monopoly power" and that "the sterile percentage of market approach should not be applied to the South Florida greyhound racing industry." *Id.* Plaintiff noted that:

Although each track may have only 25 percent of the market, the fact that only one track is operating at any given time makes each track's power significantly greater than that of a firm whose sales represent 25 percent of the normal market. According to plaintiff, the economies of this industry are such that a dog owner must be able to race year round in order to be competitive. Ignoring the Broward County track for the moment, plaintiff contends that each track has absolute monopoly power during the three months of the year when it is the only track in operation. Thus, each track can dictate the terms of booking contracts.

*Id.* In the end, we had no need to resolve the issue presented, since the plaintiff "did not present any evidence that [defendant] used its power to enhance or maintain its position." *Id.* at 1247.

On appeal, Dimmitt does not challenge CPC's claim that during 1971 and 1972 its maximum possible market shares were 25 percent and 17 percent for the national cornstarch and national corn syrup markets respectively. Neither can we find, based on the evidence presented, as well as that excluded by the trial court, that the jury here could have had any relevant market in mind other than the national cornstarch and corn syrup markets. Dimmitt produced little, however, in the way of additional structural evidence at trial. Its economic expert Hoyt's testimony was limited; his analysis led him to the following rather general conclusions:

1. That the corn wet milling industry is highly concentrated with five firms accounting for over 71% of industry capacity.

2. That the demand for cornstarch and corn syrup is price inelastic.

3. That there are few if any substitutes for cornstarch and corn syrup.

4. That Dimmitt had an absolute cost advantage technologically, and thus was able to overcome the typical barriers to entry.

5. That there has been a consistent and predictable growth in demand for cornstarch and corn syrup over time and that this demand has equalled or exceeded increasing industry capacity.

6. That the product prices for cornstarch and corn syrup were inordinately low in 1971 and 1972 while Dimmitt was in business, and that those low prices cannot be explained statistically.

7. That the low product prices for cornstarch and corn syrup were not the result of normal economic and market forces, but, rather, were caused by the predatory pricing practices of the Defendants.

8. That the fixed and variable cost coefficients projected by Dimmitt were accurate and realistic, even under the adverse anticompetitive activity of the Defendants, and would have resulted in substantial long-run profits had it not been for the Defendants' successful attempt to illegally block Dimmitt's entry.

9. That the Defendants possessed the necessary market power, which was overtly displayed in order to exclude new competition from the corn wet milling industry. . . .

Dimmitt is thus asking us to uphold a jury verdict of monopolization on the basis of structural evidence essentially limited to some very bare and very low percentage figures. Dimmitt does not present a structural explanation to compensate for the inordinately low market shares of its alleged monopolist. Compare, e.g., plaintiff's explanation in *Fulton, supra* note 10. Dimmitt presents little to demonstrate that despite its undisputedly low market shares, CPC was structurally capable of maintaining anticompetitive low prices for a sustained period of time. Dimmitt cannot cite us to any case in which monopolization was found on the basis of such meager evidence and despite undisputed proof of market shares significantly below 50 percent. Indeed, our review of the case law suggests that no such case exists.[11]

---

11. The following are Supreme Court cases upholding a finding of monopolization, with the defendants' percentage of relevant market indicated: *Otter Tail Power Co. v. United States*, 410 U.S. 366, 93 S.Ct. 1022, 35 L.Ed.2d 359 (1973) (91%); *United States v. Grinnell Corp.*, 384 U.S. 563, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966) (87%); *International Boxing Club of New York, Inc. v. United States*, 358 U.S. 242, 79 S.Ct. 245, 3 L.Ed.2d 270 (1959) (81%); *United States v. American Tobacco Co.*, 221 U.S. 106, 31 S.Ct. 632, 55 L.Ed. 663 (1911) (86%); *Standard Oil Co. v. United States*, 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619 (1911) (90%); *United States v. Aluminum Co. of America*, 148 F.2d 416 (2d Cir. 1945), *adopted and approved, American Tobacco Co. v. United States*, 328 U.S. 781, 811–14, 66 S.Ct. 1125, 1139–41, 90 L.Ed. 1575 (1946) (90%); *United States v. United Shoe Machinery Corp.*, 110 F.Supp. 295 (D.Mass.1953), *aff'd per curiam*, 347 U.S. 521, 74 S.Ct. 699, 98 L.Ed. 910 (1954) (75%); *United States v. Pullman Co.*, 50 F.Supp. 123 (E.D.Pa. 1943), *aff'd per curiam*, 330 U.S. 806, 67 S.Ct. 1078, 91 L.Ed. 1263 (1947) (100%). Indeed, former Assistant Attorney General Turner, head of the antitrust division, testified some time ago before a congressional committee that: "Section 2 refers to monopolies but not to oligopolies, and it has never been found to

Moreover, there is considerable support for the proposition that low market shares, if undisputed, make monopolization an impossibility as a matter of law. In *United States v. United States Steel Corp.*, 251 U.S. 417, 40 S.Ct. 293, 64 L.Ed. 343 (1920), the Supreme Court suggested that market power should not be equated with monopoly power. It refused to find monopoly despite a market share of 50 percent and stated that "[t]he power attained was much greater than that possessed by any one competitor—it was not greater than that possessed by all of them. Monopoly was therefore not achieved . . . ." *Id.* at 444–45, 40 S.Ct. at 296–97. And in *Alcoa*, an opinion later cited by the Supreme Court as being tantamount to a Supreme Court decision, *see American Tobacco Co. v. United States*, 328 U.S. 781, 811–14, 66 S.Ct. 1125, 1139–41, 90 L.Ed. 1575 (1946), the Second Circuit, through Judge Learned Hand, stated that while a 90 percent market share was enough to constitute monopolization, "it is doubtful whether 60 or 64 percent would be enough; and certainly 33 percent is not." 148 F.2d at 424.

Three of our recent decisions also compel the conclusion that market shares in the range of 16 to 25 percent, such as those held by CPC, are insufficient—at least absent other compelling structural evidence—as a matter of law to support monopolization. In *American Telephone & Telegraph Co. v. Delta Communications Corp.*, 408 F.Supp. 1075 (S.D.Miss.1976), *aff'd per curiam*, 579 F.2d 972 (5th Cir. 1978) (adopting district

court opinion), *modified on other grounds*, 590 F.2d 100 (5th Cir. 1979), the district court granted summary judgment on a counterclaim filed by Delta against three major television networks. Delta, a UHF Mississippi television station, alleged that "the networks together monopolized the television industry." 408 F.Supp. at 1106. Granting summary judgment for the networks, the court stated:

> Courts often have struggled with what percentage of market domination constitutes monopoly influence. . . . Possessing as they do significantly less than 50 percent of the network business, none of the network counterdefendants has the necessary market domination to be susceptible, individually, of being found to be a monopolist.

*Id.* (citations omitted). In *Yoder Brothers, Inc. v. California-Florida Plant Corp.*, 537 F.2d 1347, 1386 (5th Cir. 1976), *cert. denied*, 429 U.S. 1094, 97 S.Ct. 1108, 51 L.Ed.2d 540 (1977), we held that: "Because the correct product market was ornamental plants, and Yoder's share of that market was approximately 20 percent, . . . as a matter of law Yoder could not have been guilty of monopolization." Finally, in *Sulmeyer v. Coca Cola Co.*, 515 F.2d 835, 850 (5th Cir. 1975), *cert. denied*, 424 U.S. 934, 96 S.Ct. 1148, 47 L.Ed.2d 341 (1976), we concluded that Coca Cola's 22 percent market share of all independent bottlers was "an insignificant market share to establish monopolization in violation of section 2." [12]

cover a monopoly in an industry in which the leading firm accounts for less than 70 percent of the market." *Status and Future of Small Business, 1967: Hearings Before the Senate Select Comm. on Small Business*, 90th Cong., 1st Sess. 714 (1967), *quoted in Cliff Food Stores, Inc. v. Kroger, Inc.*, 417 F.2d 203, 207 n.2 (5th Cir. 1969).

**12.** Neither can Dimmitt draw support from our recent authorities upholding monopolization claims (references are to defendants' market shares): *Associated Radio Serv. Co. v. Page Airways, Inc.*, 624 F.2d 1342, 1352 & n.18 (5th Cir. 1980), *cert. denied*, 450 U.S. 1030, 101 S.Ct. 1740, 68 L.Ed.2d 226 (1982) ("approximately 50%"); *Heatransfer Corp. v. Volkswagenwerk A.G.*, 553 F.2d 964, 981 (5th Cir. 1977), *cert. denied*, 434 U.S. 1087, 98 S.Ct. 1282, 55 L.Ed.2d 792 (1978) (between 71 and 76%); *Woods Exploration & Producing Co. v. Aluminum Co. of America*, 438 F.2d 1286, 1307 (5th Cir. 1971),

*cert. denied*, 404 U.S. 1047 (1972) (90%); *North Texas Producers Ass'n v. Metzger Dairies, Inc.*, 348 F.2d 189, 194 (5th Cir. 1965), *cert. denied*, 382 U.S. 977, 86 S.Ct. 545, 15 L.Ed.2d 468 (1966) (between 85 and 90%); *Credit Bureau Reports, Inc. v. Retail Credit Co.*, 358 F.Supp. 780, 790–91 (S.D.Tex.1971), *aff'd*, 476 F.2d 989 (5th Cir. 1973) (85%).

Even the relatively low market share (50%) in *Page Airways* is deceptive. The relevant market in that case involved sales of electronic equipment and interior furnishings for an extremely differentiated product—a Grumman Gulfstream II ("G–II") airplane. On the question of monopoly power, we stated:

> Defendants argue that they could not be found guilty of monopolizing as a matter of law, since their market power was insufficient to support such a charge. . . . To be sure, Page's market power did not rise to the level existing in some cases that find actual

**530**

Leading academic authorities support our conclusion. Thus Areeda and Turner ask, "What quantum of power is to be characterized as 'monopoly power' in the legal sense *for purposes of section 2"*—a question that assumes that not all exercises of market power violate the strictures of section 2. Areeda & Turner, *II Antitrust Law* ¶ 600 at 1 (1978) (hereinafter cited as Areeda & Turner II). The authors' discussion of *Alcoa, supra,* is instructive. They argue that while a high (90 percent) market share does not necessarily tell us the degree of market power possessed, a low market share significantly bears on power over price.

> A producer with, say, 30% of the market could raise price by restricting his output if his competitors could not expand theirs. To cut supply by 10%, however, he would have to cut his own output by one third, which could be offset by only a 14% increase in the output of competitors, which they might be able to effect without expansion of capacity.

Areeda & Turner II, ¶ 530 at 396. Section 2 is, according to the authors, directed at persistent market power. Transitory control over prices, ever present in a competitive economy—in large part due to lags in the responses of other buyers or producers—is not the subject of the completed monopolization offense.[13] For this reason, Areeda and Turner conclude that evidence of actual control over prices—conduct evidence—is inherently weak, giving

> no reliable clue to the degree of market power that the actor possesses, and he may even have none. Relatively slight economic advantages are typically worth the legal or other costs of protecting them. . . . Conduct, in short, will rarely if ever establish substantial market power. Where power is relevant to an antitrust defense, conduct can be taken as sufficient proof only where the power requirement itself is highly attenuated.

*Id.* ¶ 515 at 345.[14]

■ We do not dispute Dimmitt's contention that its memoranda evidence, weighed with all reasonable inferences drawn in favor of the jury verdict, *Boeing Co. v. Shipman,* 411 F.2d 365 (5th Cir. 1969) (en banc), supports the conclusion that during 1971–72 CPC exercised a significant degree of control over price.[15] We conclude, however,

---

monopolization. However, when Page's market share is viewed alongside the evidence of the number of actual competitors, the high barriers to entry, the limited number of G–II's remaining at the time of the trial to be produced, and Page's power over price, we believe the court below correctly submitted the issue to the jury.

624 F.2d at 1356–57 (citations omitted). The sale of even a single additional aircraft could have significantly varied Page's market share. As the Sixth Circuit concluded in *Borden, Inc. v. FTC,* 674 F.2d 498, 512 (6th Cir. 1982):

When a seller possesses an overwhelmingly dominant share of the market, however, and differentiates its product from others through a recognized and extensively advertised brand name, thereby enabling the seller to control prices or unreasonably restrict competition, then monopoly power may be found to exist. Here Dimmitt did not dispute that fungible, undifferentiated products were involved.

**13.** Thus, Areeda and Turner conclude:

(1) The monopolization offense depends upon proof that substantial market power was (a) possessed by the defendant at the time of his exclusionary conduct, (b) achieved as a result of such conduct, or (c) threatened to be achieved by that conduct. . . .

(2) We reject the arguments that the monopolization offense can be established for firms without such power solely on the basis

of undesirable, or even of significantly anticompetitive, behavior. In particular, (a) power within a reasonably defined market is required, and (b) any refined effort to base the monopolization finding on an inverse "sliding scale" that varies the power component of the monopolization offense with the "invidiousness" of the conduct is doomed to failure. Yet, more gross versions of a sliding scale approach are inevitably involved in dealing with conduct on the road to monopoly . . . and conduct that threatens but does not achieve monopoly power. . . .

Areeda & Turner, *III Antitrust Law* ¶ 810 at 296 (1978) (hereinafter cited as Areeda & Turner III).

**14.** The authors' list of instances in which conduct might be taken as sufficient proof of power includes tying arrangements, such as in *United States v. Loew's,* 371 U.S. 38, 83 S.Ct. 97, 9 L.Ed.2d 11 (1962); *Northern Pacific R.R. Co. v. United States,* 356 U.S. 1, 78 S.Ct. 514, 2 L.Ed.2d 545 (1958), and practices illegal per se, such as horizontal price-fixing and market-sharing arrangements, as in *United States v. Socony-Vaccuum Oil Co.,* 310 U.S. 150, 224 n.59, 60 S.Ct. 811, 844 n.59, 84 L.Ed. 1129 (1940).

**15.** Dimmitt's graph suggests that CPC's list prices for corn syrup, for example, were the first down and the last up, belying CPC's claim that it was merely following competitors' price decreases.

that this conduct evidence alone is insufficient to overcome the presumption against monopoly power implied by CPC's indisputably low market shares in the two relevant undifferentiated products, corn syrup and cornstarch. Dimmitt's structural evidence is consistent with the proposition that the corn wet milling industry is only an oligopoly, with CPC as its price leader. If so, CPC's market power is dependent upon joint action by at least some of its rivals.[16] While we realize that any degree of market power tends to cause economic harm, such as high prices, low output, and underutilized capacity, an interpretation of the completed monopolization offense, to embrace *any* degree of market power, would complicate enforcement, overwhelm the enforcement machinery, and deter arguably legitimate conduct. *See* Areeda & Turner III, ¶ 813 at 300–02. We must therefore reverse the court's denial of CPC's motion for judgment n. o. v. on the completed monopolization claim.

Since in this case the jury found CPC guilty of the completed monopolization offense but not guilty of the attempt to monopolize, appellee asks us to render judgment in its favor. As in *United States v. Dunham Concrete Products, Inc.*, 501 F.2d 80, 84 (5th Cir. 1974), *cert. denied*, 421 U.S. 930, 95 S.Ct. 1656, 44 L.Ed.2d 87 (1975), "[w]e decline to construe the jury verdict as meaning the jury agreed on nothing or nonsense '. . . when a perfectly rational explanation for the jury's verdict, completely consistent with the jury's instructions, stares us in the face.' " *Quoting Schneble v. Florida*, 405 U.S. 427, 432, 92 S.Ct. 1056, 1059, 31 L.Ed.2d 340 (1972). To construe the jury verdict in the manner urged by appellee would make nonsense of the proceedings below. As Areeda and Turner point out, "[t]o say that one who has monopolized has also attempted to monopolize is redundant and adds nothing to the scope of available remedies. The attempt is merged into the complete offense." Areeda & Turner III, ¶ 830(e) at 335. The jury in this case was presented with one, and only one, theory of monopolization—namely, that CPC by its own admission cut corn syrup and cornstarch prices in 1971 and 1972 in order to exclude competition. Appellant would have us believe that, although the jury found completed monopolization on this theory, it found that the different elements of proof for an attempt case were not met.

■ The different elements of proof for a completed monopolization versus an attempt case were adequately conveyed to the jury here.[17] While cases involving both attempts and monopolization claims often fail to distinguish between the general intent element of actual monopolization and the specific intent requirement of the attempt claim, *see, e.g.*, Hawk, *Attempts to Monopolize—Specific Intent as Antitrust's Ghost in the Machine*, 58 Cornell L.Rev. 1121 (1973), in our circuit, however, the law is well established that the distinction between the two offenses is the specific intent requirement in attempt cases. *Sulmeyer v. Coca Cola Co.*, 515 F.2d at 850–51. In that case we quoted Justice Holmes in *Swift & Co. v. United States*, 196 U.S. 375, 396, 25 S.Ct. 276, 279, 49 L.Ed. 518 (1905):

Intent is . . . essential to such an attempt [to monopolize]. Where acts are not sufficient in themselves to produce a result which the law seeks to prevent,—for instance, the monopoly,—but require further acts in addition to the mere forces of

16. Thus, Hoyt's market data, *supra* slip op. at 3268–3269, at ——— drafted when CPC was not the sole defendant, notes that "the corn wet milling industry is *highly concentrated* with *five firms* accounting for over 71% of industry capacity" and that low product prices were "caused by the predatory pricing practices of the Defendant*s*." (emphasis added). The jury, however, found Dimmitt's evidence insufficient to prove either a price-fixing conspiracy under section 1, Sherman Act, or a conspiracy to monopolize under section 2.

17. Appellant does not claim error in the jury instructions. The jury's charge on § 2 reads, in pertinent part:

*The relevant time period* means the period of time from December 1970 through January 1973 in which the Dimmitt corn wet milling plant was operated by plaintiffs. Evidence concerning occurrences before and after that period may be considered insofar as it bears on occurrences during the relevant time period.

. . . .

*Specific intent to monopolize* means the specific intent of defendant to control prices or to exclude competition in a relevant market.

The following instructions pertain to specific antitrust violations alleged by plaintiffs.

nature to bring that result to pass, an intent to bring it to pass is necessary in order to produce a dangerous probability that it will happen . . . . But when that intent and the consequent dangerous probability exists, [section 2] . . . directs

II, III, AND IV
MONOPOLIZATION, ATTEMPT TO MONOPOLIZE, AND CONSPIRACY TO MONOPOLIZE

Section 2 of the Sherman Act provides: Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to *monopolize any part of the trade or commerce among the several States* . . . shall be deemed [to have violated the law] . . . .

Three separate offenses are included within Section 2 of the Sherman Act: (1) monopolization; (2) attempt to monopolize; and (3) combination or conspiracy to monopolize. You are to consider separately the facts with regard to each alleged offense.

Monopolization and attempted monopolization are violations which are committed by a single person acting independently rather than through joint action with some other person. A conspiracy to monopolize requires joint action by two or more persons.

In considering whether defendant has violated Section 2 of the Sherman Act, you must first determine the relevant market, that is, the line of commerce which defendant has allegedly monopolized, attempted to monopolize, or conspired to monopolize. The relevant market consists of two parts: the geographic market and the product market. In other words, in order to identify a relevant market, you must consider the questions of what products are involved and where those products are sold.

The relevant geographic market is the United States.

The relevant product market is that market in which there is effective competition in the sale and distribution of particular commodities and persons actually do, or potentially may, compete in the conduct of their business operations. The market includes other products which may be substitutes for the product in question, if any such substitutes exist and if they are actually competitive with the products within the market.

The plaintiffs claim that there is a separate relevant product market consisting of the production and sale of cornstarch. Defendant contends that other products, such as tapioca starch and wheat starch, compete with corn starch and should be included within the same relevant product market. Plaintiffs also claim that there is a relevant product market consisting of the production and sale of corn syrup. Defendant contends that other products, such as dextrose, levu-

itself against that dangerous probability as well as against the completed result. (citation omitted). Although inquiry into whether Coca Cola had a reasonable probability of gaining a monopoly position was obviated by lack of evidence of specific

lose (high fructose corn syrup), and sugar are substitutes for corn syrup, at least for certain customers.

Therefore, the Court instructs you that if plaintiffs fail to prove the existence of at least one of their claimed relevant product markets, then you may not find that defendant monopolized, attempted to monopolize, or conspired to monopolize trade in violation of Section 2 of the Sherman Act.

II
MONOPOLIZATION

Plaintiffs claim that defendant CPC has monopolized the relevant markets of corn starch and corn syrup in the United States, in violation of Section 2 of the Sherman Act.

The term "monopolize" means either to obtain or to maintain the power to control prices or exclude competition from a relevant market.

To find monopolization, it must appear that during the relevant time period:

(1) defendant possessed the power to stabilize or control prices or exclude competition;

(2) defendant knowingly and wilfully obtained, or maintained, the power to control prices or exclude competition from the relevant market of corn starch or corn syrup, or both; and

(3) defendant had the intent to exercise that power at that time.

Monopolization may be found to exist whenever it appears from a preponderance of the evidence that the three essential facts or conditions just stated have in fact occurred. It is not necessary that competitors actually be removed or excluded from the field before monopolization can be found.

III
ATTEMPT TO MONOPOLIZE

Plaintiffs claim that defendant CPC has attempted to monopolize the relevant markets of corn starch and corn syrup in the United States, in violation of Section 2 of the Sherman Act.

The term "attempt to monopolize" involves two essential elements: (1) a specific intent to monopolize, and (2) some predatory or anticompetitive act done in furtherance of that intent, even though insufficient actually to produce the intended monopolization. In order to find an attempt to monopolize, both elements—the intent and the act—must appear, and must together result in a dangerous probability that monopolization will sooner or later occur.

(emphasis in original).

intent in *Sulmeyer*, other authorities have addressed the point. While courts have often found market shares of ten percent or less inadequate to prove attempt, *see generally* Areeda & Turner III, ¶ 835(c) at 348–49; *Whitten v. Paddock Pool Builders*, 508 F.2d 547 (1st Cir. 1974) (three percent), *cert. denied*, 421 U.S. 1004, 95 S.Ct. 2407, 44 L.Ed.2d 673 (1975); *Mullis v. Arco Petroleum Corp.*, 502 F.2d 290, 297 (7th Cir. 1974) (three percent); *I. Haas Trucking Co. v. New York Fruit Auction Corp.*, 364 F.Supp. 868, 874–75 (S.D.N.Y.1973) (ten percent), market shares of twenty percent may raise attempt liability, depending on other characteristics of the market. Thus, in *Yoder Brothers*, 537 F.2d at 1368–69, we declined to find attempted monopolization in a case in which the defendant controlled 20 percent of the market but "[b]arriers to entry were low in the ornamental plant industry; conditions were highly competitive." *Compare United States v. Empire Gas Corp.*, 537 F.2d 296, 305–07 (8th Cir. 1976), *cert. denied*, 429 U.S. 1122, 97 S.Ct. 1158, 51 L.Ed.2d 592 (1977) (showing a 47–50% market share alone not sufficient to show dangerous probability of success for attempt to monopolize claim); *Twin City Sportservice, Inc. v. Charles O. Finley & Co.*, 676 F.2d 1291 (9th Cir. 1982) (attempted monopolization found on the basis of anticompetitive conduct; company held 24% market share); *White & White, Inc. v. American Hospital Supply Corp.*, No. 79–633CA1 540 F.Supp. 951, (W.D.Mich.1982), *reported in* 42 Antitrust & Trade Reg. Rep. (BNA) No. 1062, at 884 (April 29, 1982) (purchasing agreement between a national manufacturer-distributor of medical-surgical supplies and group of hospitals found an unlawful attempt to monopolize in five of relevant markets;

court applied 25% market share as minimum cutoff for attempt); *Lektro-Vend Corp. v. Vendo Corp.*, 403 F.Supp. 527, 533–34 (N.D.Ill.1975), *aff'd*, 545 F.2d 1050 (7th Cir. 1976), *rev'd on other grounds*, 433 U.S. 623, 97 S.Ct. 2881, 53 L.Ed.2d 1009 (1977) (company with 20% of market extracted broad noncompetition covenants; guilty of attempt to monopolize).[18]

In this unusual case, the problem with Dimmitt's monopolization claim was not lack of evidence demonstrative of intent to monopolize but rather lack of structural evidence demonstrative of ability to do so. *Cf. Forro Precision, Inc. v. IBM Corp., supra* (plaintiff failed to prove either dangerously high market power or intent to monopolize). Evidence of CPC's specific intent to monopolize, unmistakeably set forth in the company's internal memoranda, was the only basis for the jury's monopolization verdict. The jury could not have found in favor of CPC on attempt because of absence of proof of specific intent to monopolize.[19] Nor could it have conceivably found absence of a dangerous probability of monopolization given their finding that CPC had achieved monopoly. The only conceivable explanation for the jury's verdict is that given by Areeda and Turner III, ¶ 830(e) at 335—namely that the jury saw the attempt offense as redundant and unnecessary given its finding of the more serious violation. Having found in effect the defendant guilty of murder, the jury thought it inappropriate to find him guilty of attempted murder as well. In light of what the jury did in this case, the only remedy consistent with justice is to remand for a new trial on Dimmitt's attempt claim pursuant to our authority under Fed.R.Civ.P. 50(d). 5A

18. Relative to market share requisites for the completed monopolization offense, minimum market shares for the attempt offense are much more unsettled. We have already cautioned courts to be wary of the "numbers game of market percentage" when considering attempts. *Cliff Food Stores, Inc. v. Kroger, Inc.*, 417 F.2d 203, 207 n.2 (5th Cir. 1969). *Compare* Areeda & Turner III, ¶ 835 at 350 (advancing some tentative, possibly "illusory" rules of thumb on minimum market shares for the attempt offense).

Neither is the requisite of proof of dangerous probability of monopolization as secure as it once was. The Ninth Circuit has departed altogether from the rule, relying entirely on proof of specific intent to monopolize. *See, e.g., Forro Precision, Inc. v. IBM Corp., supra*. Areeda

& Turner would adopt a "limited per se" rule for attempt in cases involving "per se" illegal conduct, *e.g.*, fraudulent procurements of invalid patents (as in *Walker Process Equipment v. Food Machines & Chemical Corp.*, 382 U.S. 172, 86 S.Ct. 347, 15 L.Ed.2d 247 (1965)) and predatory pricing. Areeda & Turner III, ¶ 836 at 352–55.

19. It is, of course, well established that price cutting as a tool to eliminate competition may violate § 2. *See, e.g., Corn Products*. And even CPC admits in its appellate brief that the memoranda evidence presented by Dimmitt "if accepted at face value, might be relevant to show an intent to monopolize in an attempt case under section 2 ...."

*Moore's Federal Practice,* ¶ 50.15 (2d ed. 1982).[20] At the new trial, the jury will be given the opportunity to determine whether, although CPC's relevant market shares were inadequate to constitute achieved monopoly power, they were, together with the other structural and conduct evidence, sufficient to constitute a dangerous probability of monopolization.[21]

REVERSED AND REMANDED.

## ON SUGGESTION FOR REHEARING EN BANC

PER CURIAM:

Treating the suggestion for rehearing en banc as a petition for panel rehearing, it is ordered that the petition for panel rehearing is DENIED. No member of the panel nor any Judge in regular active service of this Court having requested that the Court be polled on rehearing en banc (Rule 35, Federal Rules of Appellate Procedure; Local Fifth Circuit Rule 16), the suggestion for Rehearing En Banc is DENIED.

In view of the tone and content of Appellant's Suggestion for Rehearing En Banc, we direct its attention to Rule 50(d), Federal Rules of Civil Procedure and the comment thereon by the Advisory Committee on 1963 Amendments to Rules, reading in pertinent part as follows:

> Subdivision (d) deals with the situation where judgment has been entered on the jury verdict, the motion for judgment n. o. v. and any motion for a new trial having been denied by the trial court. The verdict-winner, as appellee, besides seeking to uphold the judgment, may urge upon the appellate court that in case the trial court is found to have erred in entering judgment on the verdict, there are grounds for granting him a new trial instead of directing the entry of judgment for his opponent. In appropriate cases the appellate court is not precluded from itself directing that a new trial be had.

**20.** Note that we are not saying that all monopolization offenses must necessarily involve an attempt offense. They may well be cases in which a plaintiff succeeds in demonstrating a general intent to monopolize for the completed monopolization claim but fails to prove overt acts demonstrative of specific intent sufficient to carry an attempt claim. This case, however, is not one of those.

**21.** We reserve for another day one question raised by the litigants—whether proof of market power is unnecessary when the antitrust plaintiff demonstrates predatory pricing. There are authorities that would regard this as analogous to a "per se" attempt offense. *See, e.g., Janich Bros., Inc. v. American Distilling Co.,* 570 F.2d 848 (9th Cir.), *cert. denied,* 439 U.S. 829, 99 S.Ct. 103, 58 L.Ed.2d 122 (1978) (proof of predatory conduct can in some circumstances permit inferences of specific intent and dangerous probability of success); Areeda & Turner III, ¶ 836(b) at 352–55. At trial Dimmitt attempted to prove that CPC dumped its cornstarch and corn syrup prices below both its total and average variable costs for sustained periods. The issue of whether the plaintiff here demonstrated predatory pricing by CPC, joined with the troubling question of whether there are categories of conduct—such as predatory pricing—that constitute unlawful § 2 attempts with little or no proof of defendant's market power may be the subject of a second appeal in this case. They are questions that, at the outset, should be resolved by the trial court on remand. We find, with some relief, that they are at present not ripe for our review.