**Mark H. FELDMAN, Pro Se, Plaintiff,**

v.

**JACKSON MEMORIAL HOSPITAL
et al., Defendants.**

**No. 79–758–Civ–JWK.**

United States District Court,
S.D. Florida.

Sept. 19, 1983.

Mark H. Feldman, pro se.

Duane Anderson, Miami, Fla., for Dr. Marshall Hall.

Thomas Billings, Boston, Mass., for North Miami Gen. Hosp., Drs. Moriber, Drucker.

Robert Blake, Asst. County Atty., Miami, Fla., for Public Health Trust of Dade County (Jackson Memorial), Drs. Cleveland, Zeppa, McCollough, Augusto, Sarmiento, Miller, Beller, Cohen, Gurvey, Marshall Hall, Stone, Ramirez, Holmes, Pearl, Turek, Terheyden, Grable, Gregory, Cullipher Samartino.

Sean L. Fisher, Miami, Fla., for Associate Doctors Hosp. d/b/a Intern. Hosp., Dr. Ramirez.

John Hargrove, Fort Lauderdale, Fla., for South Broward Hosp. Dist. d/b/a Memorial Hosp. of Hollywood, Drs. Baxt, Berger, Crane, Fisher, Niles, Petti, Rosenbaum.

G. Bruce Hill, Orlando, Fla., for North Ridge Gen. Hosp.

Robert Jordan, Gordon James, Fort Lauderdale, Fla., for North Beach Medical Center.

John R. Kelso, Sherryll M. Dunaj, Miami, Fla., for Drs. S. Cole, Cypress Community Hosp., Humana Fla., Inc. d/b/a Humana Hosp. Bennett.

Joseph DeGance, Wilton Manors, Fla., for Doctors Gen. Hosp.

John McClure, Miami, Fla., Mt. Sinai Hosp., Cedars of Lebanon Hosp., Drs. Broadaway, Cohen, Glick, Hall, Komrad, Marne, Ramirez, Russin, Stone, Tobis, Turek, Rockwood, Weiss.

Michael J. Parenti, III, Miami, Fla., for North Broward Hosp. Dist. (including North Broward Hosp., Broward Gen. Medical Center, Imperial Point Hosp.), Drs. Terheyden, Krulik, Bronfman, F. Stein, A. Stein, Drucker, Sciaretta, Moriber, Stuart.

Burnett Roth, Miami Beach, Fla., for Fla. Medical Center.

Gerald M. Morris, Fort Lauderdale, Fla., for Holy Cross Hosp.

James H. Wakefield, Miami, Fla., for Gateway Pembroke Pines, Drs. Scott, Lestrange, Bronfman and Mendelssohn.

William Zei, Fort Lauderdale, Fla., for North Broward Hosp. Dist. (North Broward Hosp., Broward Gen. Hosp., Imperial Point Hosp.)

## MEMORANDUM DECISION AND ORDER GRANTING MOTIONS FOR DIRECTED VERDICT

KEHOE, District Judge.

### INTRODUCTION

This is a suit brought and prosecuted by a podiatrist *pro se* against 17 hospitals and 49 doctors for alleged violations of §§ 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2. Plaintiff's Amended Complaint initially alleged federal claims under the antitrust and civil rights laws. All but the Sherman Act claims were disposed of previously in *Feldman v. Jackson Memorial Hospital,* 509 F.Supp. 815 (S.D.Fla.1981).[1]

The antitrust claims proceeded to trial before a jury. In what was, in effect, a bifurcated trial,[2] plaintiff presented nearly five weeks of testimony on liability, after which all defendants moved for a directed verdict. The sole question presented by defendants' motions is whether, considering all of the evidence in the light most favorable to plaintiff, there was evidence of such quality and weight that reasonable people could reach different conclusions on the liability issues. The Court is satisfied that plaintiff failed to meet this standard, and accordingly the motions for directed verdict must be granted.[3]

### I

### SUMMARY OF FACTS

Plaintiff, Mark H. Feldman, D.P.M., ("Dr. Feldman") filed suit in 1979 alleging a combination or conspiracy in re-

---

1. Plaintiff later attempted to allege additional pendent state claims after filing his amended complaint. The Court however declined to exercise pendent jurisdiction over these claims and they are not subject to this order.

2. Prior to the commencement of trial the Court ordered the Plaintiff to limit his evidence to the liability issue only. Defendants were then expected to proceed with their case on liability. Thereafter, a determination would be made whether to permit the jury to consider the liability phase first or to proceed directly to the issue of damages. Obviously in light of the

Court's decision to grant a directed verdict for all defendants, it was unnecessary to formally bifurcate the trial of this cause.

3. The Court announced its decision and orally directed a verdict at the conclusion of plaintiff's case-in-chief. At that time a final appealable order was promised which would fully incorporate the rationale upon which the Court based its decision. See Announcement of Decision (Docket No. 853). This memorandum opinion and accompanying final judgment fulfills that promise.

straint of trade in the hospital/health care industry in violation of § 1 of the Sherman Act, and monopoly violations proscribed by § 2 of that Act. The 17 defendant hospitals are all located in Dade and Broward Counties, Florida. Five of the hospitals are public and 12 are private.[4] Dr. Feldman also named the administrators of those hospitals in his suit[5] and 49 doctors, most of whom are orthopedic surgeons. The gist of Dr. Feldman's case is his claim that all defendants acting in concert (1) conspired to prevent him from competing in the medical market-place, and attempted to monopolize the health care industry by arbitrarily rejecting his application to practice podiatry[6] as a medical staff member of the defendant hospitals, and (2) conspired to ruin his podiatry practice and run him out of business. After nearly five weeks of testimony, during which more than 80 witnesses testified, the evidence showed neither.[7]

To withstand defendants' motions on the § 1 claim, Dr. Feldman's burden was to produce substantial evidence (1) that a conspiracy existed among the defendants in which they came to a "meeting of the minds" to undertake an illegal anticompetitive act; (2) that the conduct had the effect of injuring competition in the marketplace; and (3) that plaintiff suffered some economic injury caused by the illegal acts of defendants. Similarly, on the § 2 claim,

Dr. Feldman's burden was to show by substantial evidence that one or more of the defendants had monopolized, attempted to monopolize, or conspired to monopolize some relevant product and geographic market. It is the considered judgment of the Court that Plaintiff failed to adduce sufficient evidence to permit the jury to consider these issues.

## II.

## DISCUSSION

### A. STANDARD FOR DIRECTED VERDICT MOTIONS.

The standard for a directed verdict motion is set forth in *Boeing Company v. Shipman,* 411 F.2d 365, 373–77 (5th Cir. 1969), and *Warren v. Ford Motor Credit Company,* 693 F.2d 1373, 1374–5 (11th Cir. 1982). The test is whether there is *substantial* evidence to support plaintiff's claims. Substantial evidence is "evidence of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions ... and [therefore] the case [should be] submitted to the jury. A mere scintilla of evidence is insufficient to present a question for the jury." *Boeing Company v. Shipman, supra* at 374. Directed verdicts in antitrust cases are governed by the same

---

**4.** The five public hospitals are owned by three public entities. Jackson Memorial Hospital ("Jackson") is owned by the Board of Trustees of the Public Health Trust of Dade County, Florida. The South Broward Hospital District, a special tax district in Broward County, Florida, owns and operates Memorial Hospital of Hollywood ("Memorial"). The North Broward Hospital District, a similar tax district, owns and operates Broward General Medical Center ("Broward General"), North Broward Hospital ("North Broward"), and Imperial Point Hospital ("Imperial Point").

The private hospitals are Cedars of Lebanon Hospital ("Cedars"), Mt. Sinai Medical Center ("Mt. Siani"), Florida Medical Center Hospital ("Florida Medical Center"), Bennett Community Hospital ("Bennett"), Holy Cross Hospital ("Holy Cross"), North Beach Medical Center ("North Beach"), Pembroke Pines General Hospital ("Pembroke Pines"), Doctors General Hospital ("Doctors"), International Hospital ("International"), North Miami General Hospi-

tal ("North Miami"), Cypress Community Hospital ("Cypress"), and North Ridge General Hospital ("North Ridge").

**5.** The administrators were named in the caption of the Amended Complaint but no claims were ever pursued against them. Dr. Feldman eventually agreed that the administrators should be dropped from the action and they were. See Order of Clarification issued April 21, 1983 (Docket No. 662).

**6.** Podiatrists are licensed in Florida to treat ailments of the human foot and leg below the knee, not including amputations. They may also prescribe medication which relates specifically to the scope of their authorized practice. *Fla.Stat.Ann.* § 461.003(3) (1981).

**7.** Indeed, while the evidence as a whole failed to create a jury question, as to some defendants there was no evidence offered at any point during the trial.

**1006**

standard as other cases. *Continental Ore Company v. Union Carbide and Carbon Corporation,* 370 U.S. 690, 82 S.Ct. 1404, 8 L.Ed.2d 777 (1962).

�In applying this standard, the court looks not only to the facts that have been adduced but as well to any reasonable inferences which can be drawn from those facts. However,

> [an] inference is legitimate only when the evidence offered makes the existence of the fact to be inferred more probable than the non-existence of the fact, and . . . any lesser test would permit the jury to rest its verdict on speculation and conjecture. 9 Wright & Miller, *Federal Practice* § 2528 at 565 (1971).

Conspiracy allegations may be proved by introducing circumstantial evidence but such evidence should be viewed with caution.

> Where circumstantial evidence is relied upon to establish the conspiracy or any other essential facts, it is not only necessary that all the circumstances show the existence of the conspiracy and facts sought to be proved, but such circumstantial evidence must be inconsistent with any other rational conclusion. *Weit v. Continental Illinois Nat'l Bank & Trust,* 641 F.2d 457, 463 (7th Cir.1981), *cert. denied,* 455 U.S. 988, 102 S.Ct. 1610 [71 L.Ed.2d 847] (1982) (quoting from *Pevely Dairy Co. v. United States,* 178 F.2d 363, 367 (8th Cir.1949).

In this case Dr. Feldman took almost five weeks to present his case on the liability phase alone. Aware of the fact that a conspiracy case is difficult to prove, the court gave Dr. Feldman a great deal of latitude in presenting his evidence.[8] When Dr. Feldman rested, it was clear that he had fallen short of producing the substantial evidence required to send this case to the jury against any of the defendants on his antitrust claims.

## B. FELDMAN'S CASE UNDER THE SHERMAN ACT.

### 1. *The Interstate Commerce Connection*

▪ Although the jurisdictional showing that a plaintiff must make was relaxed by *McLain v. Real Estate Board of New Orleans, Inc.,* 444 U.S. 232, 100 S.Ct. 502, 62 L.Ed.2d 441 (1980), a plaintiff must still prove "either that the business activities occurred in commerce or that those activities had an effect on commerce." *Construction Aggregate Transport v. Florida Rock Industries,* 710 F.2d 752, 766 (11th Cir.1983); *Accord, Hospital Building Co. v. Trustees of the Rex Hospital,* 425 U.S. 738, 96 S.Ct. 1848, 48 L.Ed.2d 338 (1976).

Dr. Feldman alleged in his Amended Complaint that defendants' activities had a substantial impact on interstate commerce. This court previously held that his allegations were sufficient, if proven, to invoke the Sherman Act. *Feldman v. Jackson Memorial Hospital,* 509 F.Supp. 815, 820 (S.D. Fla.1981).[9] In order to prove those allegations, this Court held in *Feldman, supra* at 820, that it was the defendants' "activity of providing medical care to patients . . . that must be connected with interstate commerce in order to sustain jurisdiction."[10]

---

**8.** In fact, the Court has accorded Dr. Feldman considerable latitude throughout the course of this litigation, particularly in ensuring that he was able to conduct discovery. The Court has been mindful from the very inception of this litigation that this Plaintiff is representing himself in a very complicated and exhaustive litigation. See *Feldman, supra* at 818.

**9.** The Court concedes that an apparent ambiguity existed on this point. The Court in *Feldman, supra* at 820, suggested that the required nexus was between the defendants' challenged activity and interstate commerce but went on to apply the more liberal test relating to the defendants general activities and interstate commerce. The Court applied the latter standard in sustaining Plaintiff's complaint against the jurisdictional attack made by the defendants.

**10.** The Court is aware that recent cases appear to reject this liberal jurisdictional standard at least in the context of hospital staff privilege claims and have adopted the more stringent jurisdictional test of making the Plaintiff establish a nexus between the defendants' *challenged activity* and interstate commerce. See e.g. *Cardio Medical Associates v. Crozer-Chester Medical Center,* 536 F.Supp. 1065, 1075–76 (E.D.Pa.1982); *Pontius v. Children's Hospital,*

■ Dr. Feldman's only proof on jurisdiction was meager and consisted of reading three or four answers to requests for admissions sent to each defendant. These admissions established no more than that some of the defendants obtained some supplies from out-of-state, treated some out-of-state patients, and received some out-of-state funds from insurance companies and Medicare. Dr. Feldman made no serious attempt to quantify any of these items or relate them in any meaningful manner to defendants' activities involved in podiatric surgery.

While the proof adduced at trial to support antitrust jurisdiction was marginal at best, the Court believes that Dr. Feldman's amended complaint should not be dismissed for lack of jurisdiction. Since the Court's decision did not rest on jurisdictional grounds, there are several other issues that must be examined to explain the directed verdict against Dr. Feldman.

### 2. Plaintiff's Section 1 Claim.

#### (a) The evidence failed to prove a conspiracy

The substance of Dr. Feldman's claim under § 1 of the Sherman Act is that the

defendants combined or conspired to prevent him from obtaining hospital privileges so that he was unable to do certain types of podiatric surgery which required operating room facilities. Dr. Feldman maintained that orthopedic surgeons are his competitors. Therefore, his reasoning goes, the defendant-orthopedic surgeons conspired among themselves and with the defendant hospitals to preclude him from practicing at those hospitals so that the orthopedic surgeons could obtain these surgical cases for themselves.

While Dr. Feldman's proof that a conspiracy existed was questionable in its entirety, specifically he failed to establish that the defendant-orthopedic surgeons were his competitors in any meaningful sense. The defendant-orthopedic surgeons who testified estimated that only one to five percent of their respective practices was devoted to the ankle or below,[11] with some of them specializing to the extent that they performed no foot or ankle surgery whatsoever. Many of the key defendant orthopedic surgeons had no private practice.[12]

■ The court previously held that a rule of reason analysis would apply in this case.[13] Dr. Feldman therefore had to estab-

552 F.Supp. 1352, 1365 (W.D.Pa.1982). These cases reject the argument that *McLain* has broadened Sherman Act jurisdiction by relating the "nexus" requirement not to the challenged conduct, but to the defendants' activities in general.

The Court believes that the Supreme Court said what it meant in *McLain* and that it meant to apply a more liberal jurisdictional standard in testing the sufficiency of plaintiff's jurisdictional allegations. *Cf. Construction Aggregate Transport v. Florida Rock Industries, supra* at 767, n. 31. Accordingly, in the absence of some controlling authority to the contrary, this Court will apply the jurisdictional test enunciated in *Feldman*. It is the law of this case.

11. Although a podiatrist's license is broader, Dr. Feldman voluntarily restricted his surgical practice to the foot and ankle because of his training and experience.

12. The University of Miami Medical School faculty was on staff at Jackson Memorial Hospital pursuant to a contract between Jackson and the University. Most full time faculty members (and all of the orthopedic faculty) participated in a "personal income plan" under which

they received a fixed salary which was not dependent upon the revenues they generated. Drs. Sarmiento, Newton McCullough and Wallace Miller were in this group. Therefore, the orthopedic surgeons at Jackson—alleged to be the cradle and hub of the conspiracy—had no economic motive to deny or limit Dr. Feldman's privileges.

Jackson also gave clinical faculty appointments to private physicians who taught residents on a part-time basis. These clinical faculty members did not admit their private patients to Jackson and were not paid for their work there. The result is that orthopedic surgeons in private practice were helping to educate new orthopedic surgeons who would then go out into the market as their competitors. This evidence is certainly inconsistent with the plaintiff's theory that the orthopedic surgeons were worried about competition from podiatrists or Dr. Feldman.

13. If this case were to be submitted to the jury, an instruction directing the jury to apply the rule of reason would be necessary. "Under this rule the fact finder weighs all of the circumstances of a case in deciding whether a

lish not only that defendants restrained trade but that their restraint was unreasonable. Additionally, the plaintiff in a rule of reason case must show that defendant's conduct had an impact upon competition in his particular business or profession, and not just upon plaintiff's business. "The true test of legality is whether the restraint imposed is such as merely regulates and perhaps thereby promotes competition or whether it is such as may suppress or even destroy competition." *Board of Trade of City of Chicago v. United States,* 246 U.S. 231, 238, 38 S.Ct. 242, 244, 62 L.Ed. 683 (1917). *See also National Society of Professional Engineers v. United States,* 435 U.S. 679, 691, 98 S.Ct. 1355, 1365, 55 L.Ed.2d 637 (1978).

■ A conspiracy under § 1 is essentially "a unity of purpose or a common design and understanding or a meeting of the minds in an unlawful arrangement ...." *American Tobacco Company Co. v. United States,* 328 U.S. 781, 810, 66 S.Ct. 1125, 1139, 90 L.Ed. 1575 (1946). Dr. Feldman produced no direct evidence of a conspiracy, and relied solely upon circumstantial evidence to prove his case. The only

evidence he offered, however, was that some defendants saw each other at meetings and in the hospitals and therefore *may* have had an opportunity to conspire. Even if true, a conspiracy will not be inferred from proof of an opportunity to conspire. *Weit v. Continental Illinois Nat'l Bank & Trust Co.,* 641 F.2d 457, 462 (7th Cir.1981), cert. denied, 454 U.S. 810, 102 S.Ct. 86, 70 L.Ed.2d 80 (1982).

■ Dr. Feldman also attempted to show a conspiracy through parallel behavior. The fact of parallel behavior, standing alone, unequivocally does not prove the existence of a conspiracy.[14] The evidence showed that the defendant hospitals, over a period of almost ten years, responded independently and differently to his requests for medical staff membership. Some hospitals granted him limited staff privileges which he found unacceptable; some refused to consider his application because there was no provision for podiatrists in their by-laws; some refused to process his application because he could not show proof of malpractice insurance required of all staff members; and some denied him privileges

restrictive practice should be prohibited as imposing *an unreasonable restraint on competition." Continental T.V. v. GTE Sylvania,* 433 U.S. 36, 49, 97 S.Ct. 2549, 2557, 53 L.Ed.2d 568 (1978) (emphasis supplied).

To determine that question the court must ordinarily consider the facts peculiar to the business to which the restraint is applied; its condition before and after the restraint was imposed; the nature of the restraint and its effect, actual or probable. The history of the restraint, the evil believed to exist, the reason for adopting the particular remedy, the *purpose or end sought* to be attained, all are relevant facts. This is not because a good intention will save an otherwise objectionable regulation or the reverse; but because knowledge of intent may help the court to interpret facts and to predict consequences. *Board of Trade of City of Chicago v. United States,* 246 U.S. 231, 238, 38 S.Ct. 242, 244, 62 L.Ed. 683 (1917). See also, *National Society of Professional Engineers v. United States,* 435 U.S. 679, 692, 98 S.Ct. 1355, 1365, 55 L.Ed.2d 637 (1978). "The Sherman Act does not require competitive bidding; it prohibits unreasonable restraints on competition." Id. 435 U.S. at 695–95, 98 S.Ct. at 1367. Accordingly, Dr. Feldman's contention that the *per se* stan-

dard should apply because this was a group boycott was rejected.

14. Proof of conspiratorial behavior requires a showing of some agreement or concerted activity to achieve an unlawful goal. Borrowing a phrase from the law of contracts, this agreement involves a "meeting of the minds" by the defendants.

An apt analogy was provided by counsel G. Bruce Hill during argument on the motions for directed verdicts:

Now, to use an analogy, if you and I go to the annual *meeting, stockholder meeting* of General Motors and they ask for a show of hands as to whether we want a dividend or not, you might be sitting at the front of the room and raise your hand and I might be sitting in the back of the room and raise my hand. We both agreed, at least to ourselves, that we wanted a dividend. We might even want it for the same reasons.

But, we didn't have a *meeting of the minds* over that. And I think that's an analogy in these hospitals. They did the same thing, a lot of them. Sometimes they did it for the same reason.

But there's been absolutely no showing of a meeting of the minds. (R. 4458–59)

because podiatry was to them a little known and ill-defined practice under community and generally accepted hospital accreditation standards. No credible evidence was presented to show that the hospitals' actions were interrelated or that their reasons were pretextual.

 Dr. Feldman spent a great deal of time presenting testimony from defendant orthopedic surgeons and hospital administrators only to have them deny his allegations of conspiracy. Quite obviously, these denials of a conspiracy do not rise to the level of proof of conspiracy. Indeed, the undeniable fact that many defendants refused to grant hospital staff privileges to plaintiff is not enough to prove a conspiracy. There was no evidence to show that any refusals were the result of an illegal agreement. The existence of an agreement being essential to a conspiracy, unilateral action alone does not violate the federal antitrust laws. *See Solomon v. Houston Corrugated Box Company,* 526 F.2d 389 (5th Cir.1976). Dr. Feldman's general accusations simply do not create an actual contest of the denials by the defendants. *Id.*

Moreover, the evidence indicated that the doctor defendants were acting in their respective roles as members of their medical staff, not in furtherance of their own practices, when they evaluated plaintiff's application. Dr. Feldman therefore failed to prove that the defendant doctors were acting for any "personal stake" when they denied his application for medical staff privileges.

(b) *The evidence failed to show market impact.*

 Even if Dr. Feldman proved that a conspiracy existed among the defendants, he failed to explain what anticompetitive effect this conspiracy had on the local medical marketplace. It is axiomatic that a conspiracy which has no effect on trade is not prohibited by the Sherman Act.

 The plaintiff in a rule of reason case must not only show that he has been injured, but that there was an antitrust injury as well. *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,* 429 U.S. 477, 489, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977). This is an "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Id.* The antitrust laws exist to protect *competition* and not for the protection of any given *competitor. Brown Shoe Company v. United States,* 370 U.S. 294, 320, 82 S.Ct. 1502, 1521, 8 L.Ed.2d 510 (1962). "Proof that the defendant's activities had an impact upon competition in a relevant market is an absolutely essential element of the rule of reason case." *Kaplan v. Burroughs Corp.,* 611 F.2d 286, 291 (9th Cir. 1979).

 Dr. Feldman presented no evidence of economic impact on anyone. He also presented no factual testimony from which the economic impact of his alleged conspiracy could be evaluated. Dr. Feldman simply failed to prove any adverse impact on competition or prejudice to the public interest. He has therefore failed to prove another essential element of his rule of reason case and was not entitled to jury consideration of his antitrust claim.

(c) *No "fact of damage."*

 In addition to proving a violation of the antitrust laws, a private antitrust plaintiff must show injury to his business or property which is causally related to the violation. 15 *U.S.C.* § 15; *Cooper Liquor, Inc. v. Adolph Coors Company,* 624 F.2d 575 (5th Cir.1980); *Kypta v. McDonald's Corp.,* 671 F.2d 1282 (11th Cir. 1982). This "fact of damage" must be shown with some reasonable degree of certainty. When the trial is bifurcated, the fact of damage or impact must be shown in the first phase in order for plaintiff to prevail on an essential element of his cause of action.

Dr. Feldman alleged that as a result of defendants' antitrust violations he was precluded from practicing his profession. By contrast, his proof showed that he actually had privileges at several hospitals. He had a successful podiatric practice near Univer-

sity Community Hospital (a non-defendant hospital) in West Broward County which he gave up in 1977 when he moved his practice to Dade County. Dr. Feldman obtained and still has privileges at Parkway General Hospital (a non-defendant) and at Bennett Community Hospital (a defendant hospital).

### 3. Plaintiff's Section 2 Claims.

■ Dr. Feldman accused defendants of all three offenses covered by § 2 of the Sherman Act: monopolization, attempt to monopolize, and conspiracy to monopolize. The general elements required to prove each of these violations are well-settled.

In order to prove actual monopolization, a plaintiff must show that defendant possesses monopoly power in the relevant market and that such power was wilfully acquired or maintained, and not merely acquired as a result of superior products, business acumen, or historical accident. United States v. Grinnell Corp., 384 U.S. 563, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966). "Monopoly power" is the power to control prices or exclude competition. United States v. E.I. du Pont de Nemours & Company, 351 U.S. 377, 76 S.Ct. 994, 100 L.Ed. 1264 (1956). The defendant must possess a very large share of the defined relevant market in order for an actual monopoly to exist. United States v. Aluminum Company of America, 148 F.2d 416 (2d Cir.1945).

■ Before it can be determined whether monopoly power exists, the plaintiff must define the relevant geographic and product market. United States v. E.I. du Pont de Nemours & Company, supra. The relevant product market includes those products which are reasonable substitutes for each other. The relevant geographic market is that area in which the defendant effectively competes with other businesses for distribution of the relevant product. Morton Buildings of Nebraska, Inc. v. Morton Buildings, Inc., 531 F.2d 910 (8th Cir.

1976). "The relevant market establishes the backdrop against which to measure economic power. It necessarily follows that 'defining the product in geographical markets is a threshold requirement under § 2'." In re Municipal Bond Reporting Antitrust Litigation, 672 F.2d 433, 441 (5th Cir.1982) (quoting Spectrofuge Corp. v. Beckman Instruments 575 F.2d 256, 276 (5th Cir.1978)).

■ Dr. Feldman made no serious attempt at trial to define either the relevant product or geographic market.[15] Although the Amended Complaint alleged that Dade and Broward Counties were the relevant geographic markets, the evidence showed that most physicians practiced actively at only two or three hospitals as a general rule because they must be able to get to the hospital quickly. Dr. Feldman defined the relevant product market in his pleadings as the rendition of surgical services, generally. This is too broad a construction of the term since Dr. Feldman was only licensed to perform procedures below the knee. He produced no evidence of the interrelationship between services performed on the foot and leg by orthopedic surgeons, podiatrists, or others such as general surgeons or even general family practitioners. Without this type of economic analysis of the relevant product and geographic markets, Dr. Feldman's monopoly claim could not be submitted to the jury.

■ Even assuming that Dr. Feldman could define the relevant product market as surgical services below the knee and the relevant geographical market as Dade and Broward Counties, he produced no evidence that any defendant had monopoly power in these markets. To the contrary, Dr. Feldman's evidence showed that there were many defendant orthopedic surgeons practicing in this area and many other orthopedic surgeons and podiatrists who were not parties to this action. Dr. Feldman's argument that the defendants collectively enjoyed monopoly power must be rejected for

---

**15.** In his Amended Complaint, Dr. Feldman defined the relevant product as surgical services. Since hospitals cannot perform surgery (they sell health care facilities), there could not be a viable monopoly claim in this action against the hospitals. They and Dr. Feldman were not competitors, nor could they be.

two reasons: first, he produced no evidence that defendants, even as a group, possessed a large enough share of whatever the relevant market is to qualify for a monopoly; second, a shared monopoly, even if proven, would not necessarily violate § 2. *Consolidated Terminal Systems v. I.T.T. World Communications,* 535 F.Supp. 225 (S.D.N.Y. 1982). Since Dr. Feldman failed to prove that any defendant enjoys monopoly power in a relevant product market, or that any defendant had the specific intent and the dangerous probability of success for monopolizing a relevant product market, there was nothing for the jury to consider under § 2 of the Sherman Act. *Id.*

▬ Dr. Feldman likewise failed to establish a case for an attempted monopoly against any defendant. As in the case of actual monopoly, a plaintiff claiming an attempt to monopolize must also prove the relevant product and geographic markets. *Morton Buildings, Inc., supra.* To prove attempted monopolization, the plaintiff must also show that the defendant had a specific intent to monopolize and that there was a dangerous probability that the attempt would succeed. *Dimmitt Agri Industries, Inc. v. C.P.C. International, Inc.,* 679 F.2d 516 (5th Cir.1982), *cert. denied* —— U.S. ——, 103 S.Ct. 1770, 76 L.Ed.2d 344 (1983); *Spectrofuge Corporation v. Beckman Instruments, supra.* Generally speaking, a defendant must have a significant market share—probably at least 20% of the relevant market—before a dangerous probability of achieving actual monopoly could be found. *Dimmitt Agri Industries, Inc., supra,* 679 F.2d at 532–533. In this case, Dr. Feldman's evidence fell short of proving either a dangerous probability of success or a specific intent to monopolize.

▬ The third offense prohibited by § 2 is a conspiracy to monopolize. Although the burden on this claim does not require proof of clearly defined relevant markets, as with an actual monopoly or attempt to monopolize claim, it is required that a "minimal showing . . . be made as to the product and geographic context of the alleged conspiracy." *Alexander v. National Farmers Organization,* 687 F.2d 1173, 1193 (8th Cir. 1982).

▬ In a conspiracy to monopolize case, the plaintiff must prove (1) an agreement or understanding between two or more economic entities, (2) a specific intent to monopolize, and (3) overt acts in furtherance of the alleged conspiracy. *Robinson v. Magovern,* 521 F.Supp. 842, 892 (W.D.Pa.1981). "In other words, conspiracy to monopolize essentially applies the law of criminal conspiracy to the monopolization context." *Zenith Radio Corp. v. Matsushita Electric Industrial Co. Ltd.,* 513 F.Supp. 1100, 1319 (E.D.Pa.1981); L. Sullivan, *Handbook of the Law of Antitrust* § 49 (1977).

▬ As the court has already discussed in the context of Dr. Feldman's § 1 claim, there was insufficient evidence of any conspiracy. Therefore, there can be no adequate evidence of a conspiracy to monopolize to present this issue for the jury's consideration. Further, Dr. Feldman failed to produce any evidence of a specific intent to monopolize.

*4. State Action Immunity.*

The defendant-public hospitals have raised the state action exemption of *Parker v. Brown,* 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1942). Recent Supreme Court cases have greatly limited the applicability of this defense. *See, Community Communications Co., Inc. v. City of Boulder,* 455 U.S. 40, 102 S.Ct. 835, 70 L.Ed.2d 810 (1982); *California Retail Liquor Dealers Ass'n v. Midcal Aluminum, Inc.,* 445 U.S. 97, 100 S.Ct. 937, 63 L.Ed.2d 233 (1980), and *City of Lafayette v. Louisiana Power & Light Co.,* 435 U.S. 389, 98 S.Ct. 1123, 55 L.Ed.2d 364 (1978). Because of Dr. Feldman's lack of proof on several essential elements of his claims, it is unnecessary for the court to discuss the applicability of this evolving doctrine and the sensitive federalism issues involved. Even assuming the public hospitals were private parties, Dr. Feldman has failed to prove his case against them. It is, therefore unnecessary to re-

solve this additional defense raised by the public hospitals.

## CONCLUSION

Dr. Feldman's failure of proof requires that defendant's Motions for Directed Verdict be GRANTED. Final Judgment will therefore be entered accordingly by separate order pursuant to this memorandum opinion.